## Richmond

ROANOKE MEMORIAL HOSPITALS

v.

JAMES B. KENLEY, M.D., et al.

No. 0038-86-3

Decided January 6, 1987

COUNSEL

Gregory M. Luce (Fulbright & Jaworksi, Miles & Stockbridge, on brief), for appellant.

John A. Rupp, Senior Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee James B. Kenley, M.D.

Virginia H. Hackney (Matthew D. Jenkins, Hunton & Williams, on brief), for appellee Lewis-Gale Hospital, Inc.

OPINION

**COLE, J.** — Roanoke Memorial Hospitals (Roanoke Memorial) appeals from a final judgment of a circuit court affirming a decision of an administrative agency. The issues on appeal are: (1) whether the circuit court erred in finding that Roanoke Memorial failed to demonstrate an error of law, as defined by Code § 9-6.14:17, in the decision of the Commissioner of Health to issue a Certificate of Need to Lewis-Gale Hospital, Inc.; and (2) whether the circuit court applied the appropriate standard of judicial review in considering the Commissioner's decision to issue the Certificate of Need. Finding no error on either issue, we

affirm.

Lewis-Gale Hospital, Inc. (Lewis-Gale) is a large, 406 bed acute care general hospital located in Salem, Virginia. Pursuant to Code §§ 32.1-102.1 *et seq.*, it applied to the Commissioner of Health for a Certificate of Need (CON) to construct a radiation therapy suite adjacent to the main hospital and to purchase the equipment necessary to initiate radiation therapy services. The application was referred by the Commissioner to those bodies required by law to review such application. Code § 32.1-102.6. The Southwest Virginia Health Systems Agency Board (SWVHSA) recommended denial of the application, contending that its health systems area already had excess capacity for such services and that the approval would introduce substantial, unnecessary and inefficient capacity into the health care system. The staff of the Department of Health reviewed the application and also recommended its denial. Lewis-Gale was then afforded the opportunity to demonstrate at an informal fact-finding conference held pursuant to Code § 9-6.14:11 that its application was consistent with the State Health Plan and the State Medical Facilities Plan. Following the conference, the hearing officer reported her findings to the Commissioner, and concluded that Lewis-Gale had demonstrated that a need existed for the radiation therapy services. The Commissioner approved this recommendation, found that a need existed for the additional services requested by Lewis-Gale, and determined that the CON should issue. Roanoke Memorial objected to the Commissioner's decision and appealed the decision to the Circuit Court of the City of Salem, which sustained the Commissioner's ruling. The judgment of the circuit court is now before us on appeal.

I.

Roanoke Memorial contends that under the provisions of Code § 32.1-102.3(A), a decision of the Commissioner to issue a CON must be consistent with the most recent applicable provisions of the State Health Plan and the State Medical Facilities Plan, unless the Commissioner finds, upon presentation of appropriate evidence, that the provisions of either plan are inaccurate, outdated, inadequate or otherwise inapplicable. Since no such finding was made, the exception is not applicable to this case. If, therefore, Roanoke Memorial established that the ruling of the Commis-

sioner was inconsistent with the State Health Plan, then as a matter of law the CON should not have been issued, and the decision of the Commissioner must be reversed by this court.

The inconsistency urged by Roanoke Memorial is that Section II.C.2.a.(3.) of the 1982 amendment to the State Health Plan provides that "[t]here should be no additional megavoltage units opened unless each existing megavoltage unit in a given medical service area is performing at least 6,000 treatment visits per year." Roanoke Memorial claims that under the evidence in this proceeding, it was conclusively proved that each existing mega voltage unit in the Lewis-Gale medical service area was not performing 6,000 treatment visits per year. Therefore, as a matter of law, the Commissioner could not issue another CON for the area. The Commissioner and Lewis-Gale contend that the provision for 6,000 treatment visits under the State Health Plan is not absolute, but simply a guideline to aid the Commissioner in his consideration of the twenty criteria set forth in Code § 32.1-102.3 for determining whether a public need for a project has been demonstrated.

The parties dispute the composition of the most recent applicable State Health Plan, but this is easily resolved. It is composed of the Virginia State Health Plan, 1980-84, Volumes 1 and 2, approved by the Governor on August 18, 1980, effective December 15, 1980. In addition, it is composed of an 1982 Amendment to the 1980-84 Virginia State Health Plan, effective September 1, 1983. These documents must be read together as one State Health Plan. One of the duties imposed upon the Virginia Statewide Health Coordinating Council (Council) is to prepare, review annually, and revise as necessary a State Health Plan. Code § 32.1-120. The 1982 Amendment is such a revision and, as indicated on the cover, was adopted pursuant to authority conferred in Code § 32.1-117 *et seq*. The amendment adds to the 1980-84 State Health Plan criteria and standards with respect to radiation therapy to provide guidance for the review of CON applications. We, therefore, look to the total State Health Plan.

The 1982 Amendment contains numerous criteria and standards, including (1) accessibility, (2) availability, (3) continuity, (4) cost, and (5) quality of radiation therapy. Roanoke Memorial contends that the Lewis-Gale application did not meet the standard pertaining to availability, which provides as follows:

*Standards*

(1) A megavoltage radiation therapy unit should treat at least 300 cancer cases annually within three years after initiation.

(2) Each radiation therapy unit should accommodate at least 6,000 treatment visits per megavoltage machine per year.

(3) There should be no additional megavoltage units opened unless each existing megavoltage unit in a given medical service area is performing at least 6,000 treatment visits per year.

The trial judge stated that "the real question involved in this case is whether the 6,000 standard is absolute or whether there is flexibility built into the [State Health] Plan." He concluded that the plan was flexible. Phrased differently, the question is whether the 6,000 standard is mandatory upon the Commissioner, or is only a recommendation.

The burden is upon the party complaining of an agency action to demonstrate an error of law subject to review. Code § 9-6.14:17. The issues of law subject to review include:

1. accordance with Constitutional right, power, privilege, or immunity;
2. compliance with statutory authority, jurisdiction limitations, or right as provided in the basic law as to the subject matter, the stated objectives for which regulations may be made;
3. observance of required procedure where any failure therein is not mere harmless error; and
4. the substantiality of the evidential support for findings of fact.

Code § 9-6.14:17.

The "basic law" of the "subject matter" of agency actions must be considered by the reviewing court. Code § 9-6.14:17. Since the Commissioner's decision to grant a CON to Lewis-Gale must be "consistent with the most recent applicable provisions of the State Health Plan," Code § 32.1-102.3, we first consider the require-

ments of the State Health Plan itself, and whether the plan is merely a guideline or whether strict compliance is required.

Initially, we note that the General Assembly has identified the purposes of the various health agencies as follows:

> The General Assembly finds that the protection, improvement and preservation of the public health and of the environment are essential to the general welfare of the citizens of the Commonwealth. For this reason, the State Board of Health and the State Health Commissioner, assisted by the State Department of Health, shall administer and provide a comprehensive program of preventive, curative, restorative and environmental health services, educate the citizenry in health and environmental matters, develop and implement health resource plans, collect and preserve vital records and health statistics, assist in research, and abate hazards and nuisances to the health and to the environment, both emergency and otherwise, thereby improving the quality of life in the Commonwealth.

Code § 32.1-2.

The General Assembly also has provided for a Statewide Health Coordinating Council (Council) consisting of not less than sixteen residents of the Commonwealth appointed by the Governor. Code § 32.1-118. The Council is authorized and directed to:

> [P]repare, review annually and revise as necessary a State Health Plan and a State Medical Facilities Plan which shall be based on the health plans prepared by the health systems agencies, with due consideration and review of other plans relating to physical and mental health services provided by agencies of the Commonwealth.

Code § 32.1-120(1). The components and methodologies for the adoption of regional health plans are "established by the Department of Health in its capacity as the designated Health Planning and Development Agency to provide consistency and uniformity and stimulate the development of regional health plans that provide a credible base for the State Health Plan." Code § 32.1-120(1). Such methodologies must "take into account special needs

or circumstances of a local area." *Id.* The Department of Health is designated as the Health Planning and Development Agency of the Commonwealth for the performance of such functions as are designated to it. Code § 32.1-121. The Commissioner of Health is given the following authority:

1. Conduct the health planning activities of the Commonwealth and, subject to the approval of the Board, implement those parts of the State Health Plan provided for in § 32.1-120 and the plans of the health systems agencies which relate to the government of the Commonwealth;
2. Prepare, review and revise as necessary a preliminary State Health Plan and a State Medical Facilities Plan which shall be based on the health plans prepared by the health systems agencies and submit such preliminary plan to the Council.

*Id.*

From these statutory provisions it can be seen that the State Health Plan is a planning and development blueprint for the health activities of the Commonwealth. The State Health Plan forms the foundation upon which the Department of Health and the Commissioner operate. The State Health Plan, however, does not bind the Department and the Commissioner to act in accordance therewith. Code § 32.1-102.3 does, however, limit the authority of the Commissioner with respect to the issuance of a CON. First, a decision to issue or approve the issuance of a certificate must be consistent with the most recent applicable provisions of the State Health Plan. Second, in determining whether such public need for a project has been demonstrated, the Commissioner must consider the twenty criteria set forth in Code § 32.1-102.3(B). The parties agree that the Commissioner did consider all of the factors provided in Code § 32.1-102.3(B).

The 1982 Amendment to the State Health Plan provides that "there *should* be no additional megavoltage units opened unless each existing megavoltage unit in a given medical service area is performing at least 6,000 treatment visits per year." (emphasis added). "Should" is the past tense of "shall." It is used in auxiliary function in a number of ways, including to express condition, obligation, propriety, or expediency, and to express futurity from a point of view in the past. It is also used to express what is proba-

ble or expected, or ought to be in the future. Webster's Seventh New Collegiate Dictionary (1961). The word "should," therefore, may be used to import discretion.

In a case involving similar facts, the Court of Appeals of Kentucky held as follows:

> The prevalent use of the word "should" in the statute and correlative regulations denotes discretion. Appellant's argument that the statutory use of the word "should" is to be construed as "shall," inasmuch as should is the past tense of shall, is without merit. We find no case in this jurisdiction upon the interpretation of the word "should" when used in a statute or regulation. However, in *University of South Florida v. Tucker*, 374 So.2d 16 (Fla. Dist. Ct. App. 1979), it was said that the word "should," when used in an administrative code, denotes discretion.

*Starks v. Kentucky Health Facilities*, 684 S.W.2d 5, 7 (Ky. Ct. App. 1984). We agree with the reasoning of the Kentucky Court of Appeals and hold that the use of the word "should" in the context of the State Health Plan was intended to confer an appropriate amount of discretionary authority in the administrative body.

Roanoke Memorial also claims that the words "consistent with" as used in Code § 32.1-102.3(A) contradicts any notion of flexibility, and demands that the Commissioner's ruling accord exactly with the requirements of the Code. We believe that "consistent with" as used in the context of the statute does not mean "exactly alike" or "the same in every detail." It means instead, "in harmony with," "compatible with," "holding to the same principles," or "in general agreement with." Both the Code and the State Health Plan recognize that the Commissioner will exercise some discretion in issuing a CON to determine whether his decision is "consistent with" the standard in the State Health Plan, including the proviso that there "should be no additional megavoltage units opened, unless each existing megavoltage unit in a given medical service area is performing at least 6,000 treatment visits per year."

The hearing officer's findings of fact are not contested. She found that radiation therapy services were provided by three hospitals in Health Service Area III: Roanoke Memorial with four

megavoltage units; Lynchburg General with one megavoltage unit; and Memorial Hospital (Danville) with one megavoltage unit. The following megavoltage radiation treatment utilization was reported:

|                    | 1982   | 1983   | 1984   |
|--------------------|--------|--------|--------|
| Roanoke Memorial   | 22,332 | 23,774 | 23,926 |
| Lynchburg General  | 5,915  | 6,357  | 6,387  |
| Danville Memorial  | 3,876  | 4,245  | 4,966  |
|                    | 32,123 | 34,376 | 35,279 |

Treatments per unit - based on five operational units:

|                    | 6,424.6 | 6,875.2 | 7,055.8 |

One of the units at Roanoke Memorial became operational on January 7, 1985. Therefore, at the time of the hearing no operational data was available on this unit. Even with six units, the average number of treatments per unit for 1984 would be 5,879.8.

The circuit court did not discuss all forty-one of the findings of fact made by the hearing officer and adopted by the Commissioner, but did briefly comment upon some of them. The court stated that the unit at Lynchburg General Hospital was performing comfortably in excess of the 6,000 treatment visits per year standard. The unit at Danville Memorial did not begin to approach the 6,000 standard, and there was no apparent reason to believe that it would do so in the foreseeable future. Based upon actual treatment visits performed by existing, operational units for the reporting year of 1984, the evidence established that the units in the Roanoke Memorial/Lewis-Gale medical service area were performing an average of 7,975 treatments per year. For the entire HSA 3, there were five units in operation. The average for these five units was 7,055 treatments. If a fourth unit was factored into the 1984 figures for the medical service area, then the average per unit dropped to 5,981. However, if the total number of treatments in the medical service area increased anywhere near the rate that it had in the past, the average per unit would have exceeded 6,000 for 1985. If the additional machine was factored into the 1984 figures for the entire HSA, the average per unit dropped. Lastly, as was apparent from the record, much of the information on which the Commissioner based his decision consisted of projections and estimates. Based upon these uncontested findings of fact, we conclude that the Commissioner's decision was

"consistent with" the State Health Plan.

## II.

Roanoke Memorial contends that the circuit court failed to apply the appropriate standard of review as prescribed by Code § 9-6.14:17. In support of this position, Roanoke Memorial argues that: (1) the Commissioner applied "the substantial evidence test" to "pure issues of law" and did not rule as a matter of law upon the issues presented as required by Code § 9-6.14:17; (2) the trial judge in the circuit court substituted his own independent analysis and judgment for that of the Commissioner in violation of the principle that when dealing with a determination or judgment made by an administrative agency, the court must review the propriety of such action solely on the grounds invoked by the agency; and (3) the "real question" on appeal was misunderstood by the circuit court as a factual issue to be resolved by reference to the substantial evidence test. We do not quarrel with the legal principles stated by Roanoke Memorial, but we find that they are not applicable to the facts of this case.

We are not left in doubt as to the standard of review applied by the trial court. In its opinion letter the court made the following statement:

At this point, I think it is important to discuss one procedural aspect of this matter so that the parties will clearly understand what standards have been applied by the Court in the review process. The Administrative Process Act envisions a formal hearing pursuant to Code Section 9-6.14:12 in all cases in which informal proceedings pursuant to Code Section 9-6.14:11 have not disposed of the case. As a result of a ruling by the Circuit Court of the City of Richmond, the parties were not afforded the opportunity for a formal hearing. One of the consequences of this is that the testimony before the commissioner was not under oath and not subject to cross-examination. Another consequence is that Code Section 9-6.14:17 distinguishes between the function of the Court in reviewing decisions resulting from formal proceedings and those resulting from informal proceedings. However, the decision of the Commissioner is obviously in the form one would expect to result from a formal proceeding. Addition-

ally, a transcript was made of the testimony given at a two-day, informal, fact-finding conference. The parties have not requested permission to put on additional evidence and the parties have briefed and argued this matter as if they expect the decision by this Court to be made on the Agency record as if a formal proceeding had been held. Accordingly, my decision will be governed by the provisions of Code Section 9-6.14:17 relating to decisions to be made on the Agency record.

Under the unusual circumstances of this case, the circuit court reviewed the Commissioner's decision as if a formal proceeding had been conducted pursuant to Code § 9-6.14:12. The parties did not object to this procedure. Code § 9-6.14:17 provides that the function of the court is "to determine only whether the result reached by the agency could reasonably be said, on all such proofs, to be within the scope of the legal authority of the agency."

Whether reviewing the Commissioner's decision as if a formal proceeding had been conducted pursuant to Code § 9-6.14:12 or an informal proceeding conducted pursuant to Code § 9-6.14:11, the circuit court was required to determine whether the Commissioner had complied with statutory or legal authority in reaching his decision. The CON law, the basic law under which the Commissioner made his decision, requires a determination of public need consistent with the most applicable provisions of the State Health Plan. *See* Code § 32.1-102.3(A).

Before the circuit court could determine whether the issuance of the CON was consistent with the State Health Plan, the court had to decide as a threshold question of law whether the State Health Plan accorded the Commissioner any flexibility. The circuit court determined as a matter of law that the State Medical Plan was flexible. In his opinion letter to counsel dated November 26, 1985, the trial judge stated:

> It is very apparent to me that the real question involved in this case is whether the 6,000 standard is absolute or whether there is flexibility built into the plans . . . . The Commissioner has in prior decisions obviously considered this standard to be flexible and did so in this case . . . . The

Commissioner determined, in essence, that the introduction of a new service at a competing hospital would not violate the plans nor the clear policy of the basic law. After a full and complete review of this record and after considering the standard for review established by Code Section 9-6.14:17, this Court cannot say that the Commissioner was necessarily wrong or that Roanoke Memorial has demonstrated any other error of law.

These remarks by the trial judge clearly show that he applied the proper standard of review. He concluded that the basic law under which the Commissioner made his ruling required the exercise of discretion and that his decision was within the scope of his legal authority. The trial judge did not apply the substantial evidence test to pure questions of law.

██ Likewise, a review of the record does not convince us that the trial judge substituted his own independent analysis and judgment for that of the Commissioner. In his opinion letter the trial judge carefully stated that the agency, and not the court, was the fact-finder in the case. The trial court reviews the facts of the case as determined by the Commissioner because it is required to determine as a matter of law whether there is substantial evidence to support the Commissioner's decision. Code § 9-6.14:17. The substantial evidence rule gives stability and finality to the fact-finding of the administrative agency. Substantial evidence refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Virginia Real Estate Commission v. Bias*, 226 Va. 264, 269, 308 S.E.2d 123, 125 (1983) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Under this standard the court may reject the findings of fact of the agency "only if, considering the record as a whole, a reasonable mind would *necessarily* come to a different conclusion." *Id.* (quoting B. Mezines, Administrative Law § 51.01 (1981)). It was necessary that the circuit court apply these principles to the facts determined by the Commissioner in order to decide whether as a matter of law there was substantial evidence to support the Commissioner's decision. In doing so, the trial court committed no error.

For the reasons stated, we affirm the decision of the circuit court.

*Affirmed.*

Koontz, C.J., and Hodges, J., concurred.