COURT OF APPEALS OF VIRGINIA

Present:  Judges Frank, Humphreys and Senior Judge Coleman
Argued at Alexandria, Virginia


LOUDOUN HOSPITAL CENTER

v.        Record No. 1273-06-4

ROBERT B. STROUBE, M.D., M.P.H.,                          OPINION BY
  STATE HEALTH COMMISSIONER,                      JUDGE SAM W. COLEMAN III
  NORTHERN VIRGINIA COMMUNITY                          OCTOBER 9, 2007
  HOSPITAL, LLC d/b/a BROADLANDS
  REGIONAL MEDICAL CENTER AND
  INOVA HEALTH CARE SERVICES
  d/b/a INOVA FAIR OAKS HOSPITAL


FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
T.J. Markow, Judge Designate

Mark S. Hedberg (Virginia H. Hackney; M. Christine Klein;
Woodrow W. Turner, Jr.; Hunton & Williams LLP, on briefs), for
appellant.

Matthew M. Cobb, Assistant Attorney General (Robert F.
McDonnell, Attorney General; David E. Johnson, Deputy Attorney
General; Jane D. Hickey, Senior Assistant Attorney General, on
brief), for appellee Robert B. Stroube, M.D., M.P.H., State Health
Commissioner.

Jeannie A. Adams (Thomas F. Hancock, III; Hancock, Daniel,
Johnson & Nagle, PC, on brief), for appellee Northern Virginia
Community Hospital, LLC d/b/a Broadlands Regional Medical
Center.

No brief for appellee Inova Health Care Services d/b/a Inova Fair
Oaks Hospital.


This case involves Virginia's Medical Care Facilities Certificate of Public Need

("COPN") Law, Code § 32.1-102.1 et seq.  Loudoun Hospital Center ("LHC") appeals from the

trial court's April 27, 2006 final order which upheld the decision of the State Health Commissioner

("the Commissioner") awarding a COPN to Northern Virginia Community Hospital, LLC d/b/a

Broadlands Regional Medical Center ("NVCH") to construct certain hospital facilities in Loudoun County. The notice of appeal encompasses prior rulings of the trial court from an initial round of litigation between the parties which culminated in the trial court's October 3, 2003 order, and will be referred to as "Broadlands I." Subsequent litigation, resulting from a remand of Broadlands I and culminating in this appeal of the April 27, 2006 order, will be referred to as "Broadlands II." On appeal, LCH presents five questions:

I. Whether the trial court erred when it concluded that NVCH was not collaterally estopped from relitigating in Broadlands II factual issues already decided against it in Broadlands I.

II. Whether the trial court erred in finding that the Broadlands II decision-making process was not irremediably and incurably tainted by secret *ex parte* communications urging approval of NVCH's project, including communications between the legislative and executive branches and the Commissioner, which were not timely revealed to LHC nor made part of the administrative record.

III. Whether the trial court erred in finding that the Commissioner's Broadlands II and Broadlands remand decisions were not arbitrary and capricious, when the Broadlands I decision came to the exact opposite result, and reached opposite conclusions on fundamental and pivotal issues, based on nearly identical facts.

IV. Whether the trial court erred in finding that the Broadlands II and Broadlands remand decisions were consistent with the State Medical Facilities Plan.

V. Whether the trial court erred in refusing to allow LHC to augment the record on the issue of taint in the Broadlands II proceeding, in light of the obstacles faced by LHC in developing and presenting such evidence before the very tribunal that had been tainted.

For the reasons that follow, we affirm the decisions of the trial court.

Background

On July 1, 2002, NVCH filed a COPN application to erect a 180-bed hospital in Loudoun County, to be known as Broadlands Regional Medical Center ("BRMC"). BRMC would replace

- 2 -

Northern Virginia Community Hospital, a 164-bed acute care facility in Arlington County, and Dominion Hospital, a 100-bed psychiatric hospital in Fairfax County. The Commissioner, by case decision dated February 23, 2003, concluded that no public need existed for NVCH's proposal. NVCH appealed the Commissioner's decision to the Loudoun County Circuit Court, which affirmed the Commissioner's decision on all substantive matters in its October 3, 2003 order.[1]

After the Commissioner had denied NVCH's application in Broadlands I, NVCH filed a second application on July 1, 2003. The second application differed from the first, most notably in the absence of additional acute care beds in the applicable health-planning region. Concurrent with his consideration of the Broadlands II application, the Commissioner considered two other applications—one from LHC to establish a thirty-three-bed acute care facility known as Western Loudoun Hospital Center, and one from Inova Health Care Services, Inc. ("Inova") to add twenty-two acute care beds to Inova Fair Oaks Hospital. Adjudication Officer Douglas R. Harris held an informal fact-finding conference ("IFFC") on November 5-6, 2003. Harris recommended, and on March 10, 2004, the Commissioner approved the award of COPNs to NVCH and Inova Health Care Services, Inc., and the denial of LHC's application.

LHC appealed to the trial court. The court, by opinion letter dated January 12, 2005, concluded "the real issues before the court only deal with the Commissioner's decision in Broadlands II. The other two COPN decisions are only relevant if the Commissioner erred in his Broadlands II decision." The court held that collateral estoppel did not bar the adjudication of issues presented in Broadlands II and that the Commissioner's decision in Broadlands II was not inconsistent with the State Medical Facilities Plan. The trial court, however, "was troubled" by

---

[1] An appeal to this Court by NVCH of the October 3, 2003 order was withdrawn on March 26, 2004.

the discovery of e-mail correspondence received and responded to by the Commissioner prior to the closing of the record on December 19, 2003. This correspondence was not made part of the official administrative record and was not made available to the competing applicants. The court found that those failures constituted violations of Code § 2.2-4019[2] and 12 VAC 5-220-60.[3] By order dated February 15, 2005, the court set aside the Commissioner's decisions regarding the three applications, and remanded the matters to the Commissioner. The court directed the Commissioner, upon remand, to reopen the record and add correspondence and other documents

---

[2] A. Agencies shall ascertain the fact basis for their decisions of cases through informal conference or consultation proceedings unless the named party and the agency consent to waive such a conference or proceeding to go directly to a formal hearing. Such conference-consultation procedures shall include rights of parties to the case to (i) have reasonable notice thereof, (ii) appear in person or by counsel or other qualified representative before the agency or its subordinates, or before a hearing officer for the informal presentation of factual data, argument, or proof in connection with any case, (iii) have notice of any contrary fact basis or information in the possession of the agency that can be relied upon in making an adverse decision, (iv) receive a prompt decision of any application for a license, benefit, or renewal thereof, and (v) be informed, briefly and generally in writing, of the factual or procedural basis for an adverse decision in any case.

B. Agencies may, in their case decisions, rely upon public data, documents or information only when the agencies have provided all parties with advance notice of an intent to consider such public data, documents or information. This requirement shall not apply to an agency's reliance on case law and administrative precedent.

[3] Written information including staff evaluations and reports and correspondence developed or utilized or received by the commissioner during the review of a medical care facility project shall become part of the official project record maintained by the Department of Health and shall be made available to the applicant, competing applicant and review bodies. Other persons may obtain a copy of the project record upon request. All records are subject to the Virginia Freedom of Information Act.

pertaining to the COPN applications, hold a hearing and enable the parties to submit additional evidence and argument, and reconsider his prior decisions.[4]

Upon remand, Harris placed the noted documents in the record, and held a hearing on April 15, 2005. In a May 11, 2005 opinion letter, Harris addressed LHC's allegations of improper influence:

> Throughout my service as an adjudication officer, I have never been pressured or otherwise influenced by any superior to recommend the approval or denial of any particular COPN project. I can comfortably and clearly state that none of the correspondence and other information at issue informed or otherwise affected the process of review I undertook and the conclusions I reached in relation to the three projects, which the Commissioner later adopted in his statutory discretion.

Harris reiterated his prior recommendations. The Commissioner adopted the recommendations on May 13, 2005.

LHC again appealed to the trial court. The court, by Opinion and Order entered April 27, 2006, concluded as follows:

> The Court finds that the ex parte contacts occurring during the administrative process were not illegal and did not improperly influence the Adjudication Officer or the Commissioner. The Court also finds that the Commissioner's decision is substantially supported by evidence in the administrative record and that a reasonable mind would not necessarily come to a different conclusion. Since this Court has previously decided that collateral estoppel does not apply and that the Commissioner's decision with regards to the Broadlands II application is not inconsistent with the State Medical Facilities Plan, the Court declines to readdress those issues here.

The court denied LHC's appeal. LHC then noted this appeal.

---

[4] LHC appealed the circuit court's decision to this Court. We dismissed the appeal, finding that it was interlocutory and that we lacked jurisdiction to entertain it. Loudoun Hosp. Center v. Stroube, Record No. 0687-05-4 (Va. Ct. App. Dec. 28, 2005).

<u>Analysis</u>

<u>General Standards of Review Governing Administrative Agency Decisions</u>

Code § 2.2-4027 governs judicial review of administrative case decisions. It reads, in pertinent part:

> The burden shall be upon the party complaining of agency action to designate and demonstrate an error of law subject to review by the court. Such issues of law include: (i) accordance with constitutional right, power, privilege, or immunity, (ii) compliance with statutory authority, jurisdiction limitations, or right as provided in the basic laws as to subject matter, the stated objectives for which regulations may be made, and the factual showing respecting violations or entitlement in connection with case decisions, (iii) observance of required procedure where any failure therein is not mere harmless error, and (iv) the substantiality of the evidentiary support for findings of fact.

Judicial review of an agency's factual findings "is limited to determining whether substantial evidence in the agency record supports its decision." <u>Avante at Lynchburg, Inc. v. Teefey</u>, 28 Va. App. 156, 160, 502 S.E.2d 708, 710 (1998). Under the substantial evidence standard, the reviewing "court may reject the agency's findings of fact 'only if, considering the record as a whole, a reasonable mind would *necessarily* come to a different conclusion.'" <u>Virginia Real Estate Comm'n v. Bias</u>, 226 Va. 264, 269, 308 S.E.2d 123, 125 (1983) (quoting B. Mezines, <u>Administrative Law</u> § 51.01 (1981)). "The phrase 'substantial evidence' refers to 'such relevant evidence as a reasonable mind *might* accept as adequate to support a conclusion.'" <u>Id.</u> (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).

> "Where . . . the issue concerns an agency decision based on the proper application of its expert discretion, the reviewing court will not substitute its own independent judgment for that of the agency but rather will reverse the agency decision only if that decision was arbitrary and capricious. [I]n reviewing an agency decision, the courts are required to consider the experience and specialized competence of the agency and the purposes of the basic law under which the agency acted."

- 6 -

Holtzman Oil Corp. v. Commonwealth, 32 Va. App. 532, 539, 529 S.E.2d 333, 337 (2000)

(quoting Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 246, 369 S.E.2d 1, 9 (1988)).

Question Presented I – Collateral Estoppel

LHC contends the trial court erred in concluding that NVCH was not collaterally

estopped from relitigating in Broadlands II factual issues already decided against it in

Broadlands I.

In its January 12, 2005 opinion letter, the trial court held:

> Collateral estoppel does not operate against a state agency performing a governmental function. See Falls v. Virginia State Bar, 240 Va. 416, 418[, 397 S.E.2d 671, 672] (1990). The court finds that the State Health Commissioner performs a governmental function in granting or denying COPN applications and therefore collateral estoppel does not apply to this administrative process.

LHC argues that the trial court confused collateral estoppel and equitable estoppel and, as

such, committed an error of law in ruling that collateral estoppel was not a bar to relitigation.

Given the posture of this case, we need not decide whether the trial court committed an error of

law. In an appeal from an administrative agency, a circuit court acts in an appellate posture and

is, in essence, the first appellate court to review the agency's determination. See Pence

Holdings, Inc. v. Auto Center, Inc., 19 Va. App. 703, 707, 454 S.E.2d 732, 734 (1995) ("On

appeal to the circuit court from an administrative body the appeal is based only upon the record

before the agency as if it were an appeal from the circuit court to an appellate court."). Thus, it

matters not whether the trial court committed an error of law. See Driscoll v. Commonwealth,

14 Va. App. 449, 452, 417 S.E.2d 312, 313 (1992) ("An appellate court may affirm the judgment

of a trial court when it has reached the right result for the wrong reason."). It matters only

whether the Commissioner erred in not ruling that collateral estoppel barred relitigation in

Broadlands II.

"The doctrine of collateral estoppel precludes the same parties to a prior proceeding from litigating in a subsequent proceeding any issue of fact that was actually litigated and essential to a final judgment in the first proceeding." Glasco v. Ballard, 249 Va. 61, 64, 452 S.E.2d 854, 855 (1995).

> [B]efore the doctrine of collateral estoppel may be applied, four requirements must be met: (1) the parties to the two proceedings must be the same; (2) the factual issue sought to be litigated must have been actually litigated in the prior proceeding; (3) the factual issue must have been essential to the judgment rendered in the prior proceeding; and (4) the prior proceeding must have resulted in a valid, final judgment against the party to whom the doctrine is sought to be applied.

Whitley v. Commonwealth, 260 Va. 482, 489, 538 S.E.2d 296, 299 (2000).

While neither this Court nor our Supreme Court has decided the standard of review to be used in determining the application of the doctrine of collateral estoppel, other courts have determined that the appropriate standard is *de novo*. See, e.g., Kent v. United of Omaha Life Ins. Co., 484 F.3d 988, 994 (8th Cir. 2007) (applying *de novo* standard of review); Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc., 458 F.3d 244, 248 (3d Cir. 2006) ("The general rule is that we exercise plenary review over the application of issue preclusion."); Eilrich v. Remas, 839 F.2d 630, 632 (9th Cir. 1988) ("The availability of collateral estoppel is a mixed question of law and fact which this court reviews de novo."); Modiri v. 1342 Rest. Group, Inc., 904 A.2d 391, 394 (D.C. 2006) ("Whether the foundational requirements for applying [t]he doctrine [of collateral estoppel] have been met presents a legal issue which we decide *de novo*."); and In re Claim of Guimarales, 503 N.E.2d 113, 115 (N.Y. 1986) ("Whether collateral estoppel applies is . . . a question of law.").

Because collateral estoppel involves mixed questions of law and fact, not pure questions of law, we apply a *de novo* standard of review as to the legal conclusions of whether collateral estoppel is applicable but we are bound by the underlying factual issues as determined by the fact

finder unless they are plainly wrong or unsupported by the evidence.  See Gilbane Bldg. Co. v.

FRB, 80 F.3d 895, 905 (4th Cir. 1996) ("We review [mixed questions of law and fact] under a

hybrid standard, applying to the factual portion of each inquiry the same standard applied to

questions of pure fact and examining *de novo* the legal conclusions derived from those facts.").

Cf. Conyers v. Martial Arts World, 273 Va. 96, 104, 639 S.E.2d 174, 178 (2007) ("an issue of

statutory interpretation is a pure question of law which we review de novo").  As such, here

"[w]e are bound by the [Commissioner's] factual findings unless those findings are 'plainly

wrong or unsupported by the evidence.'  Pyramid Development, L.L.C. v. D & J Associates, 262

Va. 750, 753, 553 S.E.2d 725, 727 (2001).  However, the [Commissioner's] application of the

law is reviewed de novo.  Brown v. Commonwealth, 270 Va. 414, 419, 620 S.E.2d 760, 762

(2005)."  Ward v. Commonwealth, 273 Va. 211, 218, 639 S.E.2d 269, 272 (2007).

LHC argued before Harris, the hearing officer, that Broadlands II consisted of the same

issues as Broadlands I and that "[t]he application has not changed in material respect."  Although

Harris did not explicitly address that argument, his implicit rejection of it is apparent.  Although

not an exhaustive list, Harris found the Broadlands II application differed from the Broadlands I

application in these respects:

- A reduction in the number of beds from 180 to 164;
- The merger of LHC with INOVA to strengthen LHC's financial status;
- The addition of an obstetrics unit at BRMC;
- NVCH's implementation of an expanded charity care policy;
- The proposed retention of emergency facilities at NVCH's Arlington facility; and
- The increased population of Loudoun County.

The Commissioner approved Harris' recommendation and by doing so adopted Harris'

factual findings.  Those findings are supported by the evidence; hence, we are bound by them.

Applying those findings to our *de novo* review, we conclude that LHC, at a minimum,

has failed to meet the second requirement of the four-part test for applying the doctrine of

collateral estoppel—"the factual issue sought to be litigated must have been actually litigated in

the prior proceeding . . . ." Whitley, 260 Va. at 489, 538 S.E.2d at 299. The distinctions noted between the Broadlands I application and the Broadlands II application are such that the factual issues of Broadlands II were not "actually litigated" in Broadlands I. Therefore, collateral estoppel does not preclude the Broadlands II litigation.

Moreover, LHC's position, if carried to its logical extension, would lead to absurd, illogical, and nonsensical results. According to that position, a medical entity would have one, and only one, opportunity to apply for a COPN for a particular project. That position would bar an applicant from taking into account the reasons and criticisms expressed by the Commissioner in his rejection of an initial application and, just as NVCH did in this case, submitting a second application addressing and correcting the reasons for the previous rejection. Indeed, Harris, in commenting on the Broadlands II application, stated, "[NVCH] clearly took to heart what we based last year's denial on." A "one-shot" approach, such as that advocated by LHC, would be antithetical to serving the public need as outlined in the COPN statutory scheme.

### Question Presented II – Tainted Process

LHC contends the trial court erred in finding that the Broadlands II decision-making process was not irreparably and incurably tainted by *ex parte* communications urging approval of the BRMC project. LHC divides its argument into three parts. Because these three parts are inextricably intertwined, however, our discussion of them is likewise intertwined.

First, LHC argues that NVCH improperly procured the intervention of the Governor in the adjudicative process by (a) soliciting and prompting the filing of e-mails, letters, and ballots with the Commissioner after the administrative record closed, and (b) successfully soliciting members of the General Assembly to write to the Governor in support of BRMC. LHC likens NVCH's actions to the crime of embracery—"an attempt corruptly to influence a juror." Wiseman v. Commonwealth, 143 Va. 631, 635, 130 S.E. 249, 250 (1925).

- 10 -

Second, LHC argues that the Commissioner has lost the presumption of official regularity, see Code § 2.2-4027 ("Whether the fact issues are reviewed on the agency record or one made in the review action, the court shall take due account of the presumption of official regularity, the experience and specialized competence of the agency, and the purposes of the basic law under which the agency has acted."), because he failed to (a) disclose documents received before and after the close of the record on December 19, 2003, (b) disclose hundreds of documents received after the Broadlands II record closed, and (c) comply with the remand order.

Finally, LHC argues that the inferences arising from NVCH's conduct lead to the conclusion that the conduct influenced, or could have influenced, the Commissioner's decision.

Four items, or points of contact, are of particular concern in evaluating LHC's contention: (1) a November 19, 2003 e-mail from the Commissioner of the Department of Mental Health and Mental Retardation and Substance Abuse Services ("MHMRSAS") to the State Health Commissioner; (2) correspondence from legislators to the Governor urging approval of BRMC; (3) a lunch meeting between the Commissioner and Bill Murray, a member of the Governor's staff; and (4) a communication between Harris and the Secretary of Health and Human Resources.

Before evaluating these items, we must first determine the standard that governs us in reviewing the Commissioner's conduct. LHC urges us to adopt the reasoning set forth in Jones v. West, 46 Va. App. 309, 616 S.E.2d 790 (2005). There, a local social services agency failed to comply with its regulations to either tape record an interview of an alleged child victim or "document in detail in the record and discuss with supervisory personnel the basis for a decision not to audio tape record an interview with an alleged child victim." 22 VAC 40-705-80(B)(1). We affirmed the circuit court's decision that the social services agency's failure to tape record the interview "constituted a procedural violation and was not mere harmless error . . . ." West,

- 11 -

46 Va. App. at 334, 616 S.E.2d at 803.  In so ruling, we asked "whether any of the procedural violations committed by the local department during its investigation of the sexual abuse complaint against West 'could have had a significant impact on the ultimate decision so as to undermine the "substantiality of the evidential support" for the factual findings.'"  Id. at 329, 616 S.E.2d at 800 (quoting Virginia Bd. of Med. v. Fetta, 244 Va. 276, 283, 421 S.E.2d 410, 414 (1992)) (other citation omitted).  Crucial to our holding in West, however, was the impossibility to recreate the interview or to cure the defect upon remand.  Id. at 332-33, 616 S.E.2d at 802.  While LHC conceded at oral argument there was no evidence of direct influence exerted on the Commissioner or hearing officer, nevertheless, as in West, LHC argues that it was likewise impossible for the Commissioner to render a fair decision under the circumstances of this case.

We disagree.  We are not convinced that a remand, coupled with disclosure of suspect contacts and documents and the opportunity for the parties to address those contacts and documents, could not cure any defect.  Rather, we are guided by the rationale employed previously by this Court and the Supreme Court:  "'No reversible error will be found . . . unless there is a clear showing of prejudice arising from the admission of [improper] evidence, or unless it is plain that the agency's conclusions were determined by the improper evidence, and that a contrary result would have been reached in its absence.'"  Johnston-Willis, Ltd., 6 Va. App. at 258, 369 S.E.2d at 16 (quoting Bias, 226 Va. at 270, 308 S.E.2d at 126) (other citation omitted).

### (1) MHMRSAS E-Mail

The trial court's remand in Broadlands II was prompted by the disclosure of the e-mail from the MHMRSAS Commissioner to the State Health Commissioner, and its subsequent transfer to Harris, the Adjudication Officer.  That e-mail reads as follows:

> As I'm sure you are very aware, any help in maintaining the number of private psychiatric beds is vital to the success of the Governor's reinvestment projects in Mental Health (closing a portion of the state MH beds and reinvesting in community MH

- 12 -

capacity) is greatly appreciated. Items such as Broadlands
Hospital COPN and the support of keeping as many private
psychiatric beds in [Northern Virginia] is particularly critical –
since we have very (and always have had) very few state
psychiatric beds at Northern Virginia Mental Health Institute.

I'd be glad to talk to you more about this – and of course there are
lots of factors related to the volume of private psychiatric beds in
the Commonwealth – but if there is any way the COPN process
can assist with that – or if you need more information from us – let
me know.

As noted, Harris disavowed the notion that this or other correspondence influenced his

decision or that he was pressured by a superior to reach a decision in favor of NVCH. Harris

wrote:

When this email was forwarded to me, I identified it as a
communication extraneous to the review process, like so many
other unexpected emails the Commissioner received. I believe it
was not produced earlier due to the absence of "Broadlands,"
"BRMC," "COPN," or "Loudoun" in its subject line. Without
these terms in the subject line, it was not discovered when
electronic searches were conducted in response to a Freedom of
Information Act request and to ensure that all documents were
placed in the Adminstrative Record, which appears to have
resulted in the inadvertent failure to reveal the existence of this
email.

The Commissioner adopted Harris' findings. Upon appeal to the trial court, the court found "that

the ex parte contacts occurring during the administrative process were not illegal and did not

improperly influence the Adjudication Officer or the Commissioner."

It is noteworthy that the remand prompted by this e-mail arose not out of its substance,

but out of its nondisclosure. In ordering the remand, the trial court noted:

The court is extremely disturbed by the Commissioner's
intentional failure to disclose this correspondence according to
[Code § 2.2-4019] and further disturbed by the Commissioner's
failure to disclose this correspondence prior to a court order
requiring it. The court finds that it was reversible error for the
correspondence not to be made part of the official administrative
record and not to be made available to a competing applicant prior
to his adjudication.

- 13 -

We have previously approved remand as a cure for alleged taint. See Branch v. Department of Alcoholic Beverage Control, 21 Va. App. 242, 250, 463 S.E.2d 340, 344 (1995). Accord D.C. Fed'n of Civic Ass'ns v. Volpe, 459 F.2d 1231, 1249 (D.C. Cir. 1971) ("We conclude that the case should be remanded to the District Court with directions that it return the case to the Secretary for him to perform his statutory function in accordance with this opinion. It seems clear that even though formal administrative findings are not required by statute, the Secretary could best serve the interests of the parties as well as the reviewing court by establishing a full-scale administrative record which might dispel any doubts about the true basis of his action.").

Here, upon remand, the e-mail was disclosed, LHC had the opportunity to present evidence in reference to the e-mail and to argue the effect of the e-mail. Nonetheless, the hearing officer, the Commissioner, and the trial court found that the e-mail did not affect the decision-making process. LHC has not convinced us to the contrary. See Johnston-Willis, Ltd., 6 Va. App. at 258, 369 S.E.2d at 16.

(2) Correspondence from Legislators

LHC complains of the presence of correspondence from legislators to the Governor in support of BMRC. It contends many of the letters were ghostwritten by NVCH representatives for certain legislators to sign, and argues that the letters improperly influenced the decision-making process.

Harris and the Commissioner rejected LHC's contention. The trial court did likewise:

> Unquestionably, several legislators wrote letters to the Governor on behalf of [NVCH] and its Broadlands Project. However, there is nothing improper about legislators writing letters to the Governor in support of a project and Loudoun Hospital Center has not pointed to any statutes or case law that prohibits legislators from contacting the Governor regarding a COPN application.

- 14 -

In Virginia, legislators, as well as others, are permitted to comment to the Commissioner on proposed projects. 12 VAC 5-220-240 reads: "Any person affected by a proposed project under review may directly submit written opinions, data and other information to the appropriate health planning agency and the Commissioner for consideration prior to their final action."

Other tribunals have addressed the issue of legislative intrusion into the administrative process. We cite with approval the test utilized by the United States Court of Appeals for the District of Columbia:

> An administrative adjudication is "invalid if based in whole or in part on [legislative] pressures." District of Columbia Fed'n of Civic Ass'ns v. Volpe, 459 F.2d 1231, 1246 (D.C. Cir.), *cert. denied*, 405 U.S. 1030 (1972) (Volpe). [Legislative] interference so tainting the administrative process violates the right of a party to due process of law. Id. at 1245-49; Pillsbury Co. v. Federal Trade Comm'n, 354 F.2d 952, 963-65 (5th Cir. 1966) (Pillsbury). "A court must consider the decision-maker's input, not the legislator's output. The test is whether 'extraneous factors intruded into the *calculus of consideration*' of the individual decisionmaker." Peter Kiewit Sons' Co. v. United States Army Corps of Eng'rs, 230 U.S. App. D.C. 72, 714 F.2d 163, 170 (D.C. Cir. 1983) (quoting Volpe, 459 F.2d at 1246) (emphasis added) (Kiewit).

ATX, Inc. v. United States Dep't of Transp., 41 F.3d 1522, 1527 (D.C. Cir. 1994).

Applying this test, and given the findings made by Harris, the Commissioner, and the trial court, we cannot say that the legislative contacts in this case "intruded into the calculus of consideration" of the decision-makers.

(3) Lunch Meeting

LHC complains that the Governor asserted improper influence over the decision-making process, and points to evidence of a lunch meeting between the Commissioner and Bill Murray, a staff member of the Governor's office, as proof thereof. The primary evidence supporting LHC's contention is a December 2, 2003 e-mail exchange between the Commissioner and Murray. The Commissioner wrote: "The IFFC on the Broadlands II group was held on Nov 5

- 15 -

and 6.  The record closes on Dec 19 and the decision is due by March 12.  Thanks for lunch."

Murray replied:  "Thanks and you are most welcome!"

Again, as noted, Harris rejected the idea that any superior had influenced the decision-making process.  The Commissioner, in approving Harris' recommendation, stated, "At no time during the review of these applications was I directed by anyone in the Executive Branch of Virginia government to approve or deny any one of them."

The trial court also addressed this issue:

> Loudoun Hospital Center suggests that Bill Murray of the Governor's Office and the Commissioner had lunch to discuss the Broadlands Project.  However, the only evidence in the record is an email from December 2, 2003 wherein the Commissioner thanks Mr. Murray for lunch and a calendar entry from November 24, 2003 noting the word "Broadlands" and indicating that Murray and David Hallock, also of the Governor's Office, would meet.  The record is silent as to whether Mr. Murray was acting on behalf of one of the applicants or what was discussed at the meeting.
>
> While an inference based upon speculation can be made that the contacts were improper, there is not adequate evidence to allow this Court to make that finding.  For this Court to determine that the contacts were illegal ex parte contacts, there must be evidence that Bill Murray met with the Commissioner for lunch while acting in support of Northern Virginia Community Hospital's Broadlands Project.  See Va. Code § 32.1-102.6(C).  There is simply no evidence in the record to support such a contention.  Furthermore, Appellant could have made that record at the administrative level, but failed to do so.

In support of the inference that the Governor improperly influenced the decision-making process, LHC points to (a) evidence of NVCH's actions to secure political and community support for BRMC, and (b) Harris' and the Commissioner's shift in views on the applications.  Yet, as the trial court noted, this inference is based on nothing more than speculation.  Evidence of the lunch meeting, even in the context of surrounding circumstances, does not demonstrate that Harris or the Commissioner allowed the Governor or his staff member to "intrude[] into the calculus of consideration" of the decision-makers.  ATX, 41 F.3d at 1527.  See also In the Matter

- 16 -

<u>of the Water Use Permit Applications</u>, 9 P.3d 409, 435 (Haw. 2000) (finding that executive actions vis-à-vis the administrative process did not rise to the level of violating a party's right to due process). At no level of these proceedings has LHC produced evidence of a nexus between the lunch meeting and the decision-making process.

(4) Communication Between Harris and
the Secretary of Health and Human Resources

In further support of its improper influence argument, LHC points to a March 5, 2004 e-mail from Harris to Jane Woods, the Secretary of Health and Human Resources. In that e-mail, a copy of which was sent to the Commissioner, Harris informs the Secretary of his decisions on the three applications and that the decisions will be released on March 10, 2004. The Secretary forwarded the e-mail to Bill Leighty, the Governor's Chief of Staff.

Harris discussed concerns about this e-mail in his May 11, 2005 Recommendation on Remand:

> This email served to comply with a standing request to apprise [the Secretary] of major COPN decisions just before they were to be released, and to offer a shorthand description of the attendant situation. It was intended, as were other similar emails routinely prepared following the finalization of my recommendations, to prevent undue surprise within the Executive Branch of Virginia government and was *not* intended to seek approval or direction. I did not receive direction from the Executive Branch regarding my recommendations, and I was not instructed or influenced by those in the upper levels of the Executive Branch to approve Community Hospital's and Inova's projects or to deny the Loudoun Hospital project.

The trial court, citing <u>ATX</u>, 41 F.3d 1522, and <u>Water Use Permit Applications</u>, 9 P.3d 409, found no impropriety:

> Without question, the Administrative Adjudication Officer in this case sent Secretary Woods a copy of the draft opinion prior to its being released. However, that the Administration should know in advance about decisions coming from a subordinate agency does not suggest any improper influence.

Although Harris informed the Secretary of the decisions five days prior to its release to the public, there is no evidence that the Secretary or anyone else in the Governor's administration responded to Harris' e-mail in any manner. Therefore, we cannot say that "intruded into the calculus of consideration" of the decision-makers. ATX, 41 F.3d at 1527.

Conclusion

For the reasons stated, we cannot say that LHC has made "a clear showing of prejudice arising from the admission of [improper] evidence, or" that "'it is plain that the agency's conclusions were determined by the improper evidence, and that a contrary result would have been reached in its absence.'" Johnston-Willis, Ltd., 6 Va. App. at 258, 369 S.E.2d at 16 (quoting Bias, 226 Va. at 270, 308 S.E.2d at 126) (other citation omitted).

Questions Presented III – Arbitrary and Capricious

LHC contends the decision in Broadlands II was arbitrary and capricious. Its argument is premised on the perception that the decision in Broadlands II was based on the same facts presented in Broadlands I.

The trial court addressed this contention in its January 12, 2005 opinion letter:

> After reviewing the record as a whole, the court finds that there is substantial evidence to support the Commissioner's findings in Broadlands II. While a different conclusion from Broadlands I may suggest an arbitrary or capricious decision, the court is not authorized to base its finding of evidentiary support on a comparison between Broadlands I and Broadlands II, but rather solely on the record of Broadlands II. Because the court finds there is substantial evidence in the record of Broadlands II to support the Commissioner's finding, the court holds that the Commissioner's decision in Broadlands II was not arbitrary and capricious. It should be noted that inconsistent decisions do not necessarily constitute an arbitrary and capricious decision, as the presence of "substantial evidence" is able to support either conclusion when weighed by the fact finder.

The trial court reiterated its ruling in a January 31, 2005 order.

On appeal, LHC argues that "[t]he Commissioner failed to adequately identify or explain the reasons supporting the Broadlands II Decision, contrary to Va. Code § 2.2-4019." We disagree. As noted above, the Commissioner, by way of the hearing officer, identified several factual differences between the applications in Broadlands I and Broadlands II:

- A reduction in the number of beds from 180 to 164;
- The merger of LHC with INOVA to strengthen LHC's financial status;
- The addition of an obstetrics unit at BRMC;
- NVCH's implementation of an expanded charity care policy;
- The proposed retention of emergency facilities at NVCH's Arlington facility; and
- The increased population of Loudoun County.

> Actions are defined as arbitrary and capricious when they are "willful and unreasonable" and taken "without consideration or in disregard of facts or law or without determining principle." Black's Law Dictionary 105 (6th ed. 1990). In Johnson v. Prince William County School Board, 241 Va. 383, 404 S.E.2d 209 (1991), we noted that an act was arbitrary and capricious if the school board "departed from the appropriate standard in making its decision." Id. at 389 n.9, 404 S.E.2d at 212 n.9.

School Bd. of the City of Norfolk v. Wescott, 254 Va. 218, 224, 492 S.E.2d 146, 150 (1997). This record does not demonstrate that the Commissioner's decision in Broadlands II was "unreasonable" or made "without consideration or in disregard of facts or law." Rather, the Commissioner, by accepting Harris' detailed recommendations, thoroughly considered the evidence in favor of and against BRMC. Nor can we say that the Commissioner "departed from the appropriate standard in making [his] decision." Indeed, Harris engaged in a painstaking discussion of the twenty factors included in Code § 32.1-102.3(B) in determining whether a public need for BRMC had been demonstrated.

Accordingly, we cannot say that the Commissioner's decision was arbitrary and capricious. Rather, substantial evidence in the record supports his decision. Considering the record as a whole, we cannot say that a reasonable mind would "necessarily" come to a different conclusion. See Bias, 226 Va. at 269, 308 S.E.2d at 125.

LHC contends that the Commissioner did not comply with Code § 32.1-102.3(A), which provides in pertinent part: "Any decision to issue or approve the issuance of a certificate shall be consistent with the most recent applicable provisions of the State Medical Facilities Plan ("SMFP")." Specifically, LHC argues that the decision was not consistent with that portion of the SMFP included in 12 VAC 5-240-30(B)(1), which reads:

> No proposal to replace acute care inpatient beds off-site, to a location not contiguous to the existing site, should be approved unless: (i) off-site replacement is necessary to correct life safety or building code deficiencies; (ii) the population served by the beds to be moved will have reasonable access to the acute care beds at the new site, or the population served by the facility to be moved will generally have comparable access to neighboring acute care facilities; and (iii) the beds to be replaced experienced an average annual utilization of 85% for general medical/surgical beds and 65% for intensive care beds in the relevant reporting period.[5]

We discussed the "consistent with" requirement in Chippenham & Johnston-Willis Hosps. v. Peterson, 36 Va. App. 469, 553 S.E.2d 133 (2001). We stated: "'"[C]onsistent with"' means '"compatible with" . . . or "in general agreement with"' rather than '"exactly alike" or "the same in every detail."'" Id. at 479, 553 S.E.2d at 138 (quoting Roanoke Mem. Hosps. v. Kenley, 3 Va. App. 599, 606, 352 S.E.2d 525, 529 (1987)). We concluded, however, that the "report recommending issuance of the COPN contained a substantial material mistake of law and, therefore, was arbitrary and capricious because its recommendation that the Commissioner issue the COPN under those circumstances was not consistent with the SMFP." Id. at 482, 553 S.E.2d at 139.

---

[5] The parties agree that the trial court erred in ruling that 12 VAC 5-240-30 was not part of the SMFP. The court, however, concluded that even if 12 VAC 5-240-30 was part of the SMFP, the Broadlands II decision was consistent with the SMFP. Therefore, the trial court's error was harmless. Moreover, in any event, our review focuses on the Commissioner's decision, not the trial court's. See Pence Holdings, Inc., 19 Va. App. at 707, 454 S.E.2d at 734.

We reach no such conclusion here, however.  Rather, our determination turns on the meaning of the word "should" as contained in 12 VAC 5-240-30(B).  In Roanoke Mem. Hosps., 3 Va. App. at 605-06, 352 S.E.2d at 529, we rejected the suggestion that the word is mandatory in nature:

> "Should" is the past tense of "shall."  It is used in auxiliary function in a number of ways, including to express condition, obligation, propriety, or expediency, and to express futurity from a point of view in the past.  It is also used to express what is probable or expected, or ought to be in the future.  Webster's Seventh New Collegiate Dictionary (1961).  The word "should," therefore, may be used to import discretion.
>
> In a case involving similar facts, the Court of Appeals of Kentucky held as follows:
>
>> The prevalent use of the word "should" in the statute and correlative regulations denotes discretion.  Appellant's argument that the statutory use of the word "should" is to be construed as "shall," inasmuch as should is the past tense of shall, is without merit.  We find no case in this jurisdiction upon the interpretation of the word "should" when used in a statute or regulation.  However, in University of South Florida v. Tucker, 374 So. 2d 16 (Fla. Dist. Ct. App. 1979), it was said that the word "should," when used in an administrative code, denotes discretion.
>
> Starks v. Kentucky Health Facilities, 684 S.W.2d 5, 7 (Ky. Ct. App. 1984).  We agree with the reasoning of the Kentucky Court of Appeals and hold that the use of the word "should" in the context of the State Health Plan was intended to confer an appropriate amount of discretionary authority in the administrative body.

Therefore, use of the word "should" in 12 VAC 5-240-30(B) required the Commissioner to consider, in the context of the application and relevant circumstances, whether "off-site replacement is necessary to correct life safety or building code deficiencies," but did not mandate rejection of the application.  The Commissioner took those factors into consideration.  LHC notes that Harris stated, "Clearly [the existing facilities] can be [replaced on site]."  In so stating,

Harris merely revealed the obvious. Any facility, if enough time, money and effort are devoted

to it, can be replaced on site. But, unlike LHC, we do not read Code § 32.1-102.3(A) and 12

VAC 5-240-30(B) as mandating an unreasonable and infeasible expenditure of time, money, and

effort to accomplish that end.

Harris made the following findings:

> The physical plants of [Community] and Dominion are in
> need of substantial upgrades, as [the Division of Certificate of
> Public Need ("DCOPN")] observes. [Health Systems Agency of
> Northern Virginia] has encouraged HCA [the parent company of
> NVCH] to replace Dominion for "nearly two decades." NVCH
> presented considerable evidence at the IF[F]C regarding
> deficiencies and circumstances that fail to comport with modern
> health care needs and expectations, including the provision of child
> and adolescent psychiatric services in an environment that is
> therapeutic and appropriately designed.

Harris concluded "on-site replacement" was "not feasible." The Commissioner accepted Harris'

findings and conclusion. Substantial evidence in the record supports the decision. Considering

the record as a whole, we cannot say that a reasonable mind would "necessarily" come to a

different conclusion. See Bias, 226 Va. at 269, 308 S.E.2d at 125.

## Question Presented V – Augmenting the Record

In January 2006, LHC filed a motion with the trial court to allow it to augment the

administrative record by, among other things, deposing the Commissioner, Harris, former

Secretary Woods, and DCOPN Director Erik Bodin. The trial court denied the motion by

Opinion and Order dated March 1, 2006:

> Rule 2A:5 of the Rules of the Virginia Supreme Court
> clearly excludes discovery for administrative appeals. In an
> agency appeal, the circuit court is not free to take evidence at the
> request of one of the parties; rather, it is obliged to defer to the trier
> of fact based upon the administrative record. The scope of review
> on appeal is limited to a determination of whether there was
> substantial evidence in the record to support the agency's decision.

Although it is within the trial court's discretion to take evidence to resolve claims of arbitrary action or bad faith, such evidence must be limited to that purporting to show that the agency denied the applicant a fair and impartial review of his application in accordance with proper procedures.

Petitioner was aware of the existence of the evidence of *ex parte* communications, but chose not to admit that evidence during the Remand Hearing or before the close of the Administrative Record. This Court cannot determine that Petitioner was denied a fair and impartial review when it was Loudoun Hospital's decision not to admit the evidence that makes the record incomplete. Petitioner should not be able to fail to create the record and then complain on appeal that the record requires augmentation.

(Citations omitted.)

Rule 2A:5 provides as follows:

Further proceedings shall be held as in a suit in equity and the rules contained in Part Two, where not in conflict with the Code of Virginia or this part, shall apply, but no matter shall be referred to a commissioner in chancery. The provisions of Part Four shall not apply and, unless ordered by the court, depositions shall not be taken.

Rule 2A:5 clearly excludes discovery for administrative appeals. Depositions may only be taken with leave of court. Therefore, the standard of review is whether the trial court abused its discretion in denying appellant's motion to take the depositions. See State Bd. of Health v. Godfrey, 223 Va. 423, 434, 290 S.E.2d 875, 880 (1982). Although it is within the trial court's discretion to take evidence to resolve claims of arbitrary action or bad faith, "such evidence should be limited to that purporting to show that the agency denied the applicant a fair and impartial review of his application in accordance with proper procedures." Id. at 434, 290 S.E.2d at 880. "Where the proffered evidence tends to show that the fact-finding procedure was tainted by unfair prejudice or animosity, the agency may be said to have decided the case on factors irrelevant to the issues of fact before it." Id. at 434, 290 S.E.2d at 881.

LHC claims "it would have been contrary to good sense and highly prejudicial to LHC to attempt to depose or subpoena the testimony of the Adjudication Officer, the Commissioner, their subordinate Bodin, and their superior Woods, at the very hearing that they were presiding over." Even so, in its motion to augment the record and/or memorandum in support thereof, LHC identifies the following individuals as possible parties to the alleged taint:

- Bill Murray, the Governor's Deputy Director of Policy
- David Haddock, Policy Advisor and Deputy Counsel to the Governor
- Bill Leighty, the Governor's Chief of Staff
- Dr. James Reinhard, the Commissioner of MHMRSAS
- Delegate Hargrove
- Senator Lambert
- Delegate Nixon
- Delegate Hall
- Senator Howell
- Senator Norment
- Senator Watkins

Upon remand, LHC had the opportunity to explore the knowledge and involvement of these individuals in the decision-making process. It made the tactical decision not to do so. The trial court, then, was presented with unequivocal disavowals of taint by Harris and the Commissioner, and LHC proffered only speculation and surmise to counter those disavowals. Given that posture, we cannot say that the trial court abused its discretion in denying the motion to augment the record.

## Conclusion

For the reasons stated, we conclude (1) collateral estoppel does not impact the Broadlands II litigation, (2) the remand ordered by the trial court was sufficient to cleanse the decision-making process of any alleged taint, (3) the Commissioner's decision was not arbitrary and capricious, (4) substantial evidence supports the Commissioner's decision that on-site replacement of NVCH's physical plants was not feasible and that the Commissioner's decision

was consistent with the SMFP, and (5) the trial court did not abuse its discretion in denying LHC's motion to augment the record.  Accordingly, we affirm.

Affirmed.