## Richmond

### Donald Mooreman Clodfelter, a/k/a John Adams v. Commonwealth of Virginia.*

June 10, 1977.
Record No. 761204.
Present: All the Justices.

*See rehearing of this case at 218 Va. 619, *infra*.

*John H. Herbig (Robert L. Harris; Harris, Tuck, Freasier & Johnson,* on brief), for plaintiff in error.

*K. Marshall Cook, Assistant Attorney General (Anthony F. Troy, Attorney General,* on brief) for defendant in error.

HARMAN, J., delivered the opinion of the Court.

The defendant, Donald Mooreman Clodfelter, also known as John Adams (defendant or Clodfelter), waived trial by jury and was found guilty by the trial court of two offenses, one a felony and the other a misdemeanor, under the Drug Control Act, Code § 54-524.1 et seq. On the felony conviction, possession of a Schedule II controlled drug, the defendant was sentenced to a

term of six years in the penitentiary with three years of that sentence suspended. On his misdemeanor conviction for possessing a Schedule III drug, the court sentenced Clodfelter to 12 months confinement in jail with the jail sentence to be served concurrently with the felony sentence.

Upon appeal the defendant challenges the validity of a search warrant, the trial court's rulings on the admissibility of certain evidence, the sufficiency of the evidence to support the convictions, and the trial court's failure to sustain the defendant's plea of collateral estoppel.

First we will consider the defendant's threshold claim of invalidity of a search warrant which resulted in the June 16, 1975 search for and the seizure of contraband drugs from a hotel room rented by Clodfelter. While not challenging the sufficiency of the affidavit to state probable cause for the issuance of a search warrant, Clodfelter argues that the search warrant, and the search made pursuant thereto, were illegal and invalid. This is so, he says, because the affidavit shows that it was subscribed and sworn to before the issuing magistrate at 1:05 A.M. and the search warrant was issued two minutes later, at 1:07 A.M. While citing no authority for his position, Clodfelter argues "it is clear that two minutes is not sufficient time for a magistrate to exercise his constitutional and statutory duties to properly analyze the affidavit, and his failure to do so makes the warrant invalid." In effect, Clodfelter argues for a *per se* rule which would invalidate any search warrant issued within a few minutes after the supporting affidavit is filed with the issuing magistrate.

We decline to adopt such a rule. The affidavit in question was on a one page printed form. Detective T. A. Collins, who signed the affidavit, testified that he filled in the relevant information showing the place to be searched, the contraband for which the search was to be conducted, and material facts establishing probable cause for issuance of the warrant and the offense in relation to which the search was to be made. He then presented the affidavit to the magistrate and made oath to its contents. Our review of the affidavit convinces us that a finding of probable cause by an experienced magistrate, who is by law presumed to have fully discharged his duties, within two minutes after receiving the affidavit would be neither unreasonable nor unusual.

Moreover, the law looks with disfavor upon inflexible mechanical rules as tending to defeat rather than attain the ends of justice. For example, attempts to quantify specific time limits under the Sixth Amendment right to speedy trial have been rejected by the Supreme Court in *Barker* v. *Wingo*, 407 U.S. 514, 523 (1972), and by this court. *Miller* v. *Commonwealth*, 217 Va. 929, 234 S.E.2d 269 (1977). Both courts have likewise declined to adopt a *per se* rule that late appointment of defense counsel in a criminal case gives rise to a presumption that counsel was ineffective. *Chambers* v. *Maroney*, 399 U.S. 42, 53-54 (1970); *Wynn* v. *Peyton*, 211 Va. 515, 518-19, 178 S.E.2d 676, 678 (1971); *See Davis* v. *Peyton*, 211 Va. 525, 528-29, 178 S.E.2d 679, 681-82 (1971).

Other questions raised by the defendant require a review of the evidence. After issuance of the search warrant, several police officers met at Clodfelter's hotel where, at about 2:00 A.M., they commenced a search of his unoccupied room. This search disclosed a large bag under the bed, which contained empty drug containers, and a brown paper bag, concealed behind a hanging wall mirror, which contained some marijuana and other contraband drugs. The officers also found a hair brush, two hair samples, a "buck" knife and an "inscribed bracelet in the shape of a spoon".

At 3:10 A.M., the officers confronted Jimmy Rufus Johnson when he unlocked the door of the room with a key. The evidence shows that the hotel issued only one key to Clodfelter when he rented the room.

Johnson, who denied that he was an occupant of the room, told the police he had been sent there by Clodfelter who told Johnson that Clodfelter had observed police at his hotel and asked Johnson to go to Clodfelter's room there to pick up the drugs if the police had not already found them. After questioning by the police, Johnson disclosed that Clodfelter could be found at a motel some thirty blocks from the hotel where the search was conducted. At 5:30 A.M., Johnson, accompanied by Detective Collins and three other police officers, went to the motel where they knocked on the door of a guest room. When the door was opened by the defendant, the officers observed the defendant and two other persons in the room. When Detective Collins asked Clodfelter to identify himself by name, Clodfelter replied that his name was John Adams. At this point Johnson, in the

defendant's presence, identified the defendant to Detective Collins as Donnie Clodfelter, the person who had sent him to the hotel room where the drugs were found.

Clodfelter was arrested and a body search was made which disclosed no drugs on his person. He was transported from the motel to a nearby police station where Detective Collins advised Clodfelter of his "Miranda rights". After receiving this warning, the defendant told Detective Collins that he had nothing to say and that he wanted to talk to his attorney. Clodfelter also told the officer that he understood his rights since "he had been through this (sic) before."

Clodfelter was then taken to his hotel. The hotel manager, who had rented the room on the preceding day to a guest who registered as Donnie Clodfelter, was unable to identify the defendant as the person to whom he rented the room. Another hotel guest, who had registered at about the same time as the defendant, was contacted but she was also unable to identify the defendant as the guest who had checked in just before she registered.

Clodfelter was returned to the police station where he was again advised of his "Miranda rights" by Detective Collins. Clodfelter reiterated that he did not want to answer any questions until he had talked with his attorney. It was about this time that the detective advised Clodfelter that he would be permitted to make a long distance call to his attorney in Richmond, approximately 100 miles away, as soon as Clodfelter had been "processed" and "booked". Clodfelter was then taken before an issuing magistrate who issued several warrants on Collins' complaint.

After issuance of warrants, Detective Collins relates:

> "He [Clodfelter] asked me if I found his knife. I stated, 'Yes'. I stated it was a good knife. Donnie further stated, 'Yeah, it was a buck-a buck knife.' He said it cost about twenty-nine fifty-nine. He further stated — we were talking about some other things that were found, like a bracelet, a hair brush, et cetera, and Donnie stated — asked — if we had found his rings and his bracelet. I asked him about the bracelet. He said what the bracelet looked like. He stated that the bracelet looked like it was made from a spoon and had some type of inscription on it referring to the penitentiary or prison. I stated that I had

recovered that, the bracelet and some rubber bands with some hair on it."

Clodfelter testified at a suppression hearing held prior to his trial. At that hearing he denied Detective Collins' testimony about the conversation set forth above and testified that he did not initiate a conversation about a knife or bracelet. The trial court found, as a fact, that Clodfelter initiated the conversation and that his statements were voluntary and not the result of custodial interrogation after Clodfelter advised the police that he would not answer questions until he had spoken with his attorney.

The evidence shows that the hotel room where the drugs were found and the contents of that room, including the drug containers, hair brush, bracelet and knife, were processed for fingerprints and that none of the defendant's fingerprints were found. The laboratory report and the chemist's testimony establish that the drugs seized in the defendant's room consisted of 1428 tablets or capsules of Schedule III drugs, 369 tablets or capsules of Schedule II drugs, 300 grams of marijuana and two "burnt hand-rolled marijuana cigarette butts".

A handwriting expert testified that he examined the signature on the hotel registration card and compared it with known exemplars of the defendant's writing. On the basis of his examination, this expert was of the opinion that Clodfelter signed the registration card.

The two hair specimens found in the hotel room were compared with a known specimen of the defendant's hair by another expert. This expert testified that one of the unidentified specimens was consistent with Clodfelter's hair in race, sex, color, diameter and microscopic characteristics but that the other unidentified specimen was not consistent.

With this evidence in mind, we will now deal with Clodfelter's challenges to two of the trial court's rulings on the admissibility of evidence. Clodfelter asserts that the trial court erred in failing to sustain his objection on hearsay grounds to Detective Collins' testimony that Johnson identified the defendant as Donnie Clodfelter after Clodfelter told Collins that he was John Adams.

"The theory of the hearsay rule is that, when a human utterance is offered as evidence of the truth of the fact

asserted in it, the credit of the assertor becomes the basis of our inference, and therefore the assertion can be received only when made upon the stand, subject to the test of cross-examination. If, therefore, an extrajudicial utterance is offered, not as an assertion to evidence the matter asserted, but *without reference to the truth of the matter asserted,* the hearsay rule does not apply. The utterance is then merely not obnoxious to that rule. It may or may not be received, according as it has any relevancy in the case; but if it is not received, this is in no way due to the hearsay rule." VI Wigmore, Evidence § 1766. (Chadbourne rev. 1976).

Here the evidence was offered, not to establish the identity of the defendant whose identity was so clearly established as not to be an issue at trial, but to establish the defendant's conduct and the circumstances surrounding his arrest. Clearly, this evidence was relevant and the defendant's objection was without merit.

■ The defendant further argues that the trial court erred in admitting evidence of Clodfelter's conversation with Detective Collins after Clodfelter had received the "Miranda" warnings and had declined to answer further questions until he had talked with his attorney. As we noted earlier, the trial court, on conflicting evidence at the suppression hearing, found that this statement was not the result of custodial interrogation, that the conversion was initiated by the defendant, and that the statement was voluntary. The record fully supports this finding of fact by the trial court. We hold, therefore, that the trial court did not err in admitting this evidence, *Massie* v. *Commonwealth,* 211 Va. 429, 432-33, 177 S.E.2d 615, 617 (1970), for, as the Supreme Court said in *Miranda* v. *Arizona,* 384 U.S. 436 (1966), referring to volunteered statements:

"In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. *Any statement given freely and voluntarily without any compelling influence is, of course, admissible in evidence.* The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to

confess to a crime, *or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected* by our holding today." *Id.* at 478 (emphasis supplied, footnote omitted).

We will now consider the defendant's contention that the trial court erred in failing to sustain his plea of collateral estoppel to the indictments under which he was convicted. The Supreme Court, relying on *Benton* v. *Maryland,* 395 U.S. 784 (1969), incorporated the doctrine of collateral estoppel into the Fifth Amendment proscription against double jeopardy by its decision in *Ashe* v. *Swenson,* 397 U.S. 436 (1970).

In *Ashe* the Supreme Court said the doctrine of collateral estoppel means that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." 397 U.S. at 443. As we observed in *Jones* v. *Commonwealth,* 217 Va. 231, 228 S.E.2d 127 (1976):

"The decision in *Ashe* has resulted in a multitude of cases involving myriad factual situations upon which defendants have sought to invoke the doctrine of collateral estoppel. Citation of the many cases would be unduly burdensome and would serve no useful purpose. Suffice to say, the numerous attempts to invoke the doctrine have met with little success, a result that was easily predictable. As the Second Circuit Court of Appeals has stated, *Ashe* 'was the rare case where it was possible to determine with certainty what the jury in the earlier prosecution had decided.' *United States* v. *Cioffi,* 487 F.2d 492, 498 (1973), *cert. denied,* 416 U.S. 995 (1974). And, as the Second Circuit has observed in another case, 'Since it is usually impossible to determine with any precision upon what basis the jury reached a verdict in a criminal case, it is a rare situation in which the collateral estoppel defense will be available to a defendant.' *United States* v. *Tramunti,* 500 F.2d 1334, 1346, *cert. denied,* 419 U.S. 1079 (1974).

"*Ashe* requires that the question whether the rule of collateral estoppel applies in a given case is to be approached 'with realism and rationality.' The Court established these guidelines: 'Where a previous judgment of acquittal was based

upon a general verdict, as is usually the case, this [realistic and rational] approach requires a court to "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." ' 397 U.S. at 444. Or, as more succinctly stated by the Second Circuit in *Tramunti, supra:*

" 'In order to establish that the present prosecution is barred by the previous acquittal . . . the burden is on the appellant to show that the verdict there *necessarily* decided the issues now in litigation.' 500 F.2d at 1346." *Id.* at 233, 228 S.E.2d at 128-29.

■ The party seeking the protection of collateral estoppel has the burden of proving that the precise issue or question he seeks to preclude was raised and determined in the first action. *United States* v. *Friedland,* 391 F.2d 378 (2d Cir. 1968); *United States* v. *Davis,* 460 F.2d 792, 796 (4th Cir. 1972).

With these principles in mind we now look to the record to see whether it supports Clodfelter's plea. Here, as in the trial court, Clodfelter relies upon the transcript of a hearing on August 25, 1975, before the Virginia Beach General District Court. From the transcript it appears that the General District Court had several warrants before it for consideration. While the number of warrants and the precise nature of the charges they contained are unclear from the transcript, the Attorney General, in the Commonwealth's brief, tells us that there were six warrants charging: (1) possession of drug paraphernalia; (2) possession of marijuana; (3) possession of opium with intent to distribute; (4) possession of marijuana with intent to distribute; (5) possession of Schedule II drugs, amphetamines; and (6) possession of Schedule III depressant drugs with intent to distribute. The first two of these charges were misdemeanors, which came within the jurisdiction of the General District Court, and the latter four charges were felonies, in which the General District Court's jurisdiction was limited to conducting a preliminary hearing.

At an early stage in the hearing, the possession of opium charge was dismissed on motion of the Commonwealth's Attorney who advised the court that the laboratory report on that charge was "negative". The Commonwealth then introduced

the laboratory report showing the analysis of the substances discovered in the defendant's hotel room. This report revealed that large quantities of Schedule II and Schedule III drugs were seized, along with 300 grams of marijuana and two "burnt hand-rolled marijuana cigarette butts". Two police officers, Detective Collins and Detective Richard Chrisman, testified about their search of Clodfelter's hotel room and established the chain of custody of the seized substances. Collins testified that the pills and "[t]he marijuana" were in a paper bag concealed behind a hanging wall mirror. Collins further testified about accompanying Johnson to the motel where the defendant was arrested, the defendant's statement to the detective concerning the defendant's identity and Clodfelter's subsequent question and conversation, after criminal warrants had been issued against him, about the personal items found in the hotel room. In the testimony before the General District Court, there was no evidence showing the presence of drug paraphernalia in the hotel room or on the defendant's person, and the only evidence concerning marijuana was that related above, that "[t]he marijuana" was in the bag with the pills.

After the Commonwealth rested its case, the defendant moved to dismiss. After argument, this motion was denied; the defendant indicated that he would not offer evidence; and the court, finding probable cause, certified the three felony cases, including possession of marijuana with intent to distribute, for grand jury action. The defendant, calling the misdemeanor warrants to the court's attention, renewed his motion for a dismissal of those charges, arguing that a higher burden of proof, i.e., not proof of probable cause but proof beyond a reasonable doubt, rested upon the Commonwealth in the misdemeanor cases. The trial court, after hearing this argument, dismissed the two misdemeanor charges.

This, the defendant argues, shows conclusively that the General District Court found as a fact that Clodfelter was not shown to possess the marijuana seized, an essential element which had to be proved to establish the crime of the possession of marijuana. Thus, he argues, the Commonwealth is collaterally estopped to again litigate the factual issue of possession of the other substances found at the same place in the same container, the paper bag behind the mirror. Clodfelter also points out that the Circuit Court, upon his motion, sustained a plea of res ad-

judicata to a companion indictment returned against him for possession of marijuana with intent to distribute, a ruling from which the Commonwealth had no appeal.

■ While the conclusion for which Clodfelter argues is one that can be drawn from the record, an examination of the record discloses that this conclusion is not the only rational basis upon which the General District Court, which set forth no grounds for its action, could have grounded its action. Most certainly, the possession of the drug paraphernalia charge was dismissed because there was no evidence before the court showing the presence of drug paraphernalia on Clodfelter's person or in his room. But the evidence clearly established the presence of marijuana in the room. It is not unreasonable or irrational to conclude from the record that the General District Court's dismissal, therefore, of the misdemeanor charge of possession of marijuana was grounded, not upon the lack of the evidence of possession, but upon the court's belief that this offense was subsumed in the more serious felony charge, possession of marijuana with intent to distribute, which the court had just certified to the grand jury.

While there are probably other rational conclusions that might be drawn from the record, it suffices to say that Clodfelter, who had the burden of showing that the precise factual issue or question which he now seeks to preclude was *necessarily* decided in the General District Court, has failed to carry that burden.

■ From our earlier review of the evidence, we have concluded that the defendant's challenge to its sufficiency is without merit. While some of this evidence was of a circumstantial character, the evidence, considered as a whole, sustains the trial court's findings of guilt.

For all of these reasons, the judgments of conviction will be affirmed.

*Affirmed.*