COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Chief Judge Decker, Judges Beales and White
Argued by videoconference


TREQUAN DEVONTE JAMES

                                              MEMORANDUM OPINION* BY
v.        Record No. 0896-21-2          CHIEF JUDGE MARLA GRAFF DECKER
                                                    DECEMBER 6, 2022
COMMONWEALTH OF VIRGINIA


             FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                          Phillip L. Hairston, Judge

          Daniel W. Hall (Law Office of Daniel W. Hall, on brief), for
          appellant.

          Timothy J. Huffstutter, Assistant Attorney General (Jason S.
          Miyares, Attorney General, on brief), for appellee.


        Trequan Devonte James challenges his convictions for first-degree murder and use of a

firearm in the commission of a felony in violation of Code §§ 18.2-32 and -53.1.  He contends

that the trial court erred by admitting certain evidence and concluding that the evidence as a

whole was sufficient to support his convictions.  To the extent that the appellant preserved these

assignments of error for appeal, we hold that the admission of the challenged evidence was not

error and that the evidence supported the jury's findings of guilt.[1]  Consequently, we affirm the

appellant's convictions.

_____

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

        [1] Because we hold that the challenged evidentiary rulings were not error, we do not
consider the parties' competing arguments regarding whether any error in admitting that
evidence was harmless.

BACKGROUND[2]

On September 22, 2019, the appellant murdered Jamal Ellis, his maternal uncle. At the time, they lived together in a City of Richmond residence, along with other members of their extended family.

On the evening of the murder, Richard Archer, a cousin of the victim and the appellant, was at the residence with the victim when the appellant "entered . . . in a rush." The appellant asked the victim whether he had his gun with him and then asked the victim to accompany him to a store. Archer noticed some sort of "tension" between the two men. When they left the house, the victim had on dark clothing, and the appellant was wearing a white t-shirt, a baseball cap, and black-and-white tennis shoes.

Two witnesses, LaKeisha Murray and Crystal Hinton, observed the men from different vantage points as the appellant shot the victim a short time later while they were in the street. Both women testified at trial.

Murray, who did not know the men, lived near the corner where the shooting occurred. While studying that night, she heard the "loud" and "very aggressive" voice of a male whom she thought was on a cell phone. She looked outside but did not see anyone, and "the voice got low," so she returned to studying.

Later, Murray heard the same male voice along with a female voice, and someone said, "Back up. Get away from me." Murray opened her door slightly and saw two men on the corner facing each other. She could tell the people were arguing and that the male she could hear "was more so the aggressor." Then she heard the woman's voice say, "Tre, stop," "Tre, chill," and "Cool and chill, Tre." Murray continued watching as one of the men, who was wearing a white

_____

[2] "On appeal, we review the evidence in the 'light most favorable' to the Commonwealth," the party who prevailed in the trial court. *Flanders v. Commonwealth*, 298 Va. 345, 350 (2020) (quoting *Vasquez v. Commonwealth*, 291 Va. 232, 236 (2016)).

- 2 -

shirt and dark jeans, reached from "behind on [his] . . . side." She saw a flash and heard what sounded "like a firework." The victim grabbed the left side of his chest, briefly walked toward the shooter, and then turned and ran away. The shooter followed the victim, and when both men were outside Murray's line of vision, she "hear[d] another [gun]shot."

Hinton was on the street nearby at the time of the shooting and provided more detail about what happened and why. She dated the appellant for at least two years, but he had broken up with her two weeks prior to the shooting. Between the breakup and the night of the murder, Hinton had been talking and texting with the appellant. She and the victim were also friends, and she continued to talk and text with him too. Hinton had "been hearing about drama" among the appellant, the victim, and a third man—a relative named Trevon. She reported, as a result, "that things were not all peachy keen with these three men" on the evening of September 22. According to Hinton, the appellant was "mad," and his anger was directed specifically at the victim because the victim had told Hinton "something . . . very personal" about the appellant.

Hinton was present in the area of the murder because soon after the appellant found out that the victim had told her the "very personal" thing that day, the appellant asked her to meet him "down the street" from the family residence. Hinton did as he asked, and sometime afterward, the appellant and the victim walked up Decatur Street together and passed Spaine Street, near where Hinton was parked. The victim continued up the street toward the store, while the appellant paced back and forth near the intersection. By Hinton's account, the appellant was on the phone with his new girlfriend, and Hinton described him as "angry at that situation, . . . separate from what was going on with" the victim.

A few minutes later, the victim rejoined the appellant on Decatur Street, and the appellant "confronted" him about what he had told Hinton. Hinton described the appellant as "livid" with the victim. The appellant pulled out a gun and fired three times at the victim from "[v]ery close"

- 3 -

range, but the gun jammed, and no bullets were expelled. The appellant "manipulat[ed]" the gun and fired a fourth shot, this time hitting the victim in the chest. The victim ran away, and the appellant followed him. Once the men were out of view, Hinton heard a fifth gunshot. The shooting occurred no more than an hour and a half after the appellant learned that the victim had told Hinton a "very personal" thing about him.[3]

Immediately after the shooting, the appellant ran to Hinton's car, got in still holding the gun, and told her to make a U-turn rather than drive past the family residence. The two went to a convenience store on Midlothian Turnpike and afterward to a nearby hotel. Surveillance videos showed them at both locations with the appellant wearing a white shirt and long dark shorts.

The next morning, the appellant left the hotel, and Hinton went home. Later that day, Hinton picked up the appellant and they checked into a different hotel. Hinton told the appellant that she had to go home to tend to her child. After she went home, she drove to the Richmond Police Department and told Detective Patrick Mansfield that she witnessed the appellant shoot the victim. Hinton then lied to Mansfield about where the appellant was at that time, telling him that she did not know. After leaving the police station, she returned to the hotel and spent a second night with the appellant.

The following morning, Hinton received a text saying that a warrant had been issued for the appellant's arrest. She did not respond to the text and instead went to work. The appellant went with her, telling her "he didn't have anywhere to go." He remained outside in her car while she went inside. Hinton "panicked" and called 911. She "made up a lie saying that [the appellant] had kidnapped her" and then told police where they could find him.

---

[3] The victim was transported to the hospital but died from a single gunshot wound to his chest, which was delivered at close range.

At the time of the appellant's arrest outside Hinton's workplace, Chesterfield County police found a gun on the floorboard where he had been sitting. Forensic examination determined that two cartridge casings and a bullet fragment found at the scene of the victim's shooting were fired from that gun. Hinton testified that the appellant had that gun with him when he shot the victim and each time she saw him afterward.

Additional evidence linked the appellant to the gun. Archer testified that on the afternoon after the shooting, the extended family gathered at the family residence. When the appellant arrived at the gathering, family members "question[ed him] about the night before." The appellant got "real upset" and waved a firearm at everyone. Archer recognized the gun as one that he had previously seen the appellant carry because of "discoloration" on "the slide" and "a modified piece on the side." He also noted that while the appellant was wielding the gun, it "jammed on" him and he "[m]ov[ed] the slide" to try to "unjam it."

At trial, the appellant objected to the admission of two types of evidence. He sought to exclude evidence of the firearm found on the car floorboard by the seat he occupied at the time of his arrest in Chesterfield County. He also sought to exclude a surveillance camera video purporting to show the Richmond murder. The trial court denied the motions.

At the close of the Commonwealth's evidence and again at the close of all the evidence, the appellant made motions to strike. He argued that Murray's descriptions of the shooter and the victim were inconsistent and that Hinton's identification of him as the shooter was incredible because she was "thoroughly impeached." Defense counsel also argued that the facts did not support premeditation. After the trial court denied the motions, the jury convicted the appellant of first-degree murder and use of a firearm in the commission of a felony.

The appellant made a motion to set aside the verdict. He renewed his challenges to the admission of evidence about the firearm found at the time of his arrest. The appellant also

renewed his request to exclude the surveillance video based on lack of authentication. Finally, he challenged the sufficiency of the evidence based on the credibility of Hinton, the only person who specifically identified him as the shooter. The trial court denied the motion to set aside the verdict. It then sentenced the appellant in accordance with the jury's verdict to thirty-one years for the murder and three years for the firearm offense with none of that time suspended.

## ANALYSIS

The appellant challenges the admission of two categories of evidence. He also contests the sufficiency of the evidence to support his convictions.

### I. Admissibility-of-Evidence Issues

The appellant contends that the trial court erred by admitting evidence of the firearm found during his arrest. He further asserts that a video of the murder was erroneously admitted. These evidentiary issues are subject to the same standard of review.

"Decisions regarding the admissibility of evidence 'lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion.'" *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019) (quoting *Michels v. Commonwealth*, 47 Va. App. 461, 465 (2006)). "This bell-shaped curve of reasonability" guiding appellate review "rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." *Minh Duy Du v. Commonwealth*, 292 Va. 555, 564 (2016) (quoting *Sauder v. Ferguson*, 289 Va. 449, 459 (2015)). A reviewing court can conclude that "an abuse of discretion has occurred" only in cases in which "reasonable jurists could not differ" about the correct result. *Commonwealth v. Swann*, 290 Va. 194, 197 (2015) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)). We examine the appellant's evidentiary claims in light of these well-established principles.

- 6 -

A.  Firearm and Related Evidence

The appellant objected at trial to the admission of the firearm found during his arrest in Chesterfield County two days after the victim's murder in the City of Richmond.  He also objected to body camera footage and photographs showing the position of the firearm in the car at that time.  The appellant relies on the fact that he was acquitted of "felony possession of [a] firearm" in Chesterfield County.  Citing principles of collateral estoppel, res judicata, and double jeopardy, he contends that the Chesterfield acquittal "prevented [the Commonwealth] from relitigating his knowing possession of the firearm" in his Richmond trial and rendered the related evidence inadmissible in that trial.[4]

First, we resolve the appellant's claims regarding res judicata and double jeopardy on procedural grounds.  Rule 5A:18 provides that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable th[e] Court [of Appeals] to attain the ends of justice."  "Making one specific [objection] on an issue does not preserve a separate legal point on the same issue for [appellate] review."  *Hamilton v. Commonwealth*, 69 Va. App. 176, 189 (2018) (quoting *Edwards v. Commonwealth*, 41 Va. App. 752, 760 (2003) (en banc), *aff'd by unpub'd order*, No. 040019 (Va. Oct. 15, 2004)).  "[T]he objecting party need not cite specific legal authority to the trial court in order to rely on it on appeal," but that party "must present the objection itself with sufficient particularity to permit the judge, if he or she agrees, to take necessary action."  *Jones v. Commonwealth*, 71 Va. App. 597, 607 (2020).

Here, the appellant argued expressly to the trial court *only* that collateral estoppel principles prevented the Commonwealth from offering evidence that a firearm was found by his

---

[4] The appellant references a fourth legal theory supporting his assignment of error—issue preclusion.  We consider this as part of his collateral estoppel claim.  *See Lane v. Bayview Loan Servicing, LLC*, 297 Va. 645, 654 (2019) (equating collateral estoppel and issue preclusion).

seat in the car at the time of his Chesterfield arrest. He did not argue that res judicata or double jeopardy precluded the admission of that evidence. We therefore hold that these two issues are barred, and we consider the merits of only his collateral estoppel claim.

Collateral estoppel means that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Commonwealth v. Davis*, 290 Va. 362, 369-70 (2015) (quoting *Ashe v. Swenson*, 397 U.S. 436, 443 (1970)). Determining whether the doctrine applies "involves mixed questions of law and fact." *Id.* at 368 (quoting *Loudoun Hosp. Ctr. v. Stroube*, 50 Va. App. 478, 493 (2007)). The appellate court "appl[ies] a de novo standard of review as to . . . whether [the doctrine] is applicable," but it is "bound by the underlying [facts] as determined by the fact finder unless they are plainly wrong or unsupported by the evidence." *Id.* at 368-69 (quoting *Stroube*, 50 Va. App. at 493).

Of critical importance in this case is that a defendant seeking to invoke the doctrine of collateral estoppel must prove that "the precise issue [of fact] . . . he seeks to preclude was raised and determined in the first action." *Id.* at 369 (quoting *Clodfelter v. Commonwealth*, 218 Va. 98, 106 (1977)). When applying the doctrine "in the usual instance of a 'general verdict,' the reviewing court must 'examine the record of [the] prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter.'" *Id.* at 370 (quoting *Ashe*, 397 U.S. at 444). Only after conducting such a review is the court able to "conclude whether a rational [fact finder] could have grounded [the] verdict upon an issue [of fact] other than that which the defendant seeks to foreclose." *Id.* (quoting *Ashe*, 397 U.S. at 444).

Here, the appellant simply proffered the Chesterfield Circuit Court's order reflecting his acquittal of the offense of possession of a firearm by a felon based on an offense date of September 24, 2019. The prosecutor stipulated to the fact of the acquittal, but he noted that the

- 8 -

offense required proof of three elements—proof that the defendant possessed the item, that the item was a firearm, and that the defendant was a convicted felon. The prosecutor noted further that the proffered order did not explain on which element or elements the jury found the evidence insufficient, and he refused to stipulate to what had occurred in that Chesterfield court. Defense counsel did not offer any additional evidence to permit the trial court to determine the basis on which the Chesterfield jury acquitted him.[5]

This record supports the trial court's ruling that the appellant failed to establish that the precise fact relevant to the admissibility issue in his Richmond murder trial (whether the appellant possessed the firearm found in the car at the time of his arrest in Chesterfield) was resolved by his acquittal on the Chesterfield felon-in-possession-of-a-gun charge. Consequently, we hold that the trial court's refusal to exclude the firearm and related photos on collateral estoppel grounds was not error.

### 2. Video of Surveillance Footage of Murder

The appellant contends that the trial court erred by admitting a video recording of another video—home security surveillance footage that Hinton testified captured the victim's murder.

At trial, the appellant argued that the Commonwealth could not authenticate the video without testimony from the person who sent it to the police as an attachment to a text message. He further suggested that due to the extreme blurriness of the video and the lack of timestamps, the video provided no way to tell if it had been edited and bore "no indicia of reliability."

In this Court, the appellant acknowledges that a video, like a photograph, may be introduced as a "silent witness." He nonetheless argues that the video was "inadequate . . . to

---

[5] Defense counsel attempted to proffer what occurred and said she could obtain additional information about the Chesterfield proceedings, including a trial transcript. Counsel alluded to requesting a continuance if the trial court were inclined to grant one. The court replied that any such request came too late. The appellant does not suggest on appeal that he made a formal motion for a continuance or, even if he did, that the denial of any such motion was error.

stand as a silent witness." He further suggests that the video and related photographs were inadmissible because Hinton, the only witness who testified that the video "accurately depicted the ev[ents] in question," was "inherently incredible."

First, we consider the appellant's argument that the trial court erred by admitting the video under a "silent witness" theory.[6] Videos are generally admitted under one of two theories: "*either* to illustrate a witness'[s] testimony *or* to serve as an 'independent silent witness' of matters depicted in the video." *Bennett v. Commonwealth*, 69 Va. App. 475, 487-88 (2018) (quoting *Bailey v. Commonwealth*, 259 Va. 723, 738 (2000)). Admitting a video as a silent witness typically requires the testimony of its maker for authentication purposes. *See Bailey*, 259 Va. at 738; *Bennett*, 69 Va. App. at 488 n.7. However, when someone who witnessed the events in a video testifies that it accurately represents what took place, it is not admitted under a silent witness theory, and the testimony of its maker is not required. *See Bailey*, 259 Va. at 738. Here, the trial court expressly adopted the prosecutor's argument that the video was admissible based solely on the testimony of Hinton, a person who appeared in the video and confirmed that it showed "exactly what happened that night." In those circumstances, no testimony from "anybody who downloaded the video" or "who might have carried the video from one place to

---

[6] The Commonwealth asserts that the appellant did not make this "silent witness" argument below. We assume without deciding that he did so. *See McGinnis v. Commonwealth*, 296 Va. 489, 501 (2018) (holding that where a court's ability to review an issue on appeal is "in doubt," the court "may 'assume without deciding' that the issue can be reviewed provided that this permits [the Court] to resolve the appeal on the best and narrowest ground[]").

The Commonwealth further suggests that the appellant waived his right to contest the admission of the video in its entirety under the principle that "an objection to evidence cannot be availed of by a party who has, at some other time during the trial, . . . permitted [the same evidence] to be brought out . . . without objection." *See Burns v. Bd. of Supers.*, 227 Va. 354, 363 (1984) (emphasis omitted) (quoting *Whitten v. McClelland*, 137 Va. 726, 741 (1923)). The record, however, does not affirmatively establish that the video played during Murray's testimony, which was not referred to by exhibit number, was in fact the same video. Accordingly, we decline to hold that the appellant waived his assignment of error in this fashion.

another" was needed. Therefore, the record reflects that the trial court did not admit the video under a silent witness theory. Instead, it was admitted to illustrate witnesses' testimony.

Second, to the extent that the appellant preserved his argument that the video was inadmissible because it was "a copy of a copy . . . transferred by text message" and was of "poor quality," that argument fails on the merits. Any "antecedent facts" upon which the admissibility of evidence depends are "determined by the [trial] court." *Lynch v. Commonwealth*, 46 Va. App. 342, 349 (2005) (quoting *Mullins v. Commonwealth*, 113 Va. 787, 791 (1912)), *aff'd*, 272 Va. 204, 208 (2006). Such findings must be supported by a preponderance of the evidence. *See Hicks v. Commonwealth*, 71 Va. App. 255, 275 (2019) (citing *Bloom v. Commonwealth*, 262 Va. 814, 821 (2001)); Va. R. Evid. 2:901. "[A]uthentication does not set a high barrier to admissibility[] and is generally satisfied by any form of proof that supports a finding that [the evidence] is what it purports to be." *Atkins v. Commonwealth*, 68 Va. App. 1, 9 (2017) (first alteration in original) (quoting Charles E. Friend & Kent Sinclair, *The Law of Evidence in Virginia* § 17-1, at 1164 (7th ed. 2012)). Once this threshold for proving admissibility has been met, the evidence should be admitted, and any claimed gaps in the evidence or other deficiencies are relevant to the trier of fact's assessment of its weight rather than to its admissibility. *See Kettler & Scott, Inc. v. Earth Tech. Cos.*, 248 Va. 450, 459 (1994); *cf. Atkins*, 68 Va. App. at 9 (holding that texts and tweet met minimum authentication requirements to prove that the defendant authored them and "[t]he completeness of the identification [went] to the weight" rather than admissibility (first alteration in original) (quoting *Armes v. Commonwealth*, 3 Va. App. 189, 193 (1986))).

Here, Hinton testified that the video and its contents, although not entirely clear, showed "exactly what happened" when the appellant shot the victim. The trial court adopted the prosecutor's rationale that although he could "understand [defense counsel's] argument about

[the video] being blurry," that point was "a jury issue . . . go[ing] to weight[,] . . . not admissibility." The court found that the video was of adequate quality to aid the finder of fact at trial. Again, consistent with the trial court's ruling, once the threshold for proving admissibility has been met, any claimed deficiencies in the evidence are for the finder of fact to resolve in determining what weight to give that evidence.

Third, we resolve on procedural grounds the appellant's claim that Hinton's testimony was inadequate to authenticate the video because her testimony was inherently incredible. In the trial court, the appellant suggested only that Hinton was not an *appropriate* witness to authenticate the video because she was not the person who recorded it or sent it to law enforcement. The court ruled on the first day of trial that the video was admissible based on Hinton's testimony that she "was there" and the video provided "an accurate depiction of everything that happened." The appellant did not directly raise the issue of Hinton's credibility in any context until the third day of trial, well after the video was admitted. At that time, he challenged her credibility only in the context of the sufficiency of the evidence when he moved to strike at the close of the Commonwealth's case. *See Bowling v. Commonwealth*, 51 Va. App. 102, 106 (2007). Accordingly, he failed to preserve his claim that Hinton's testimony did not provide a foundation for the admission of the home surveillance video footage because it was inherently untrustworthy or incredible. *See* Rule 5A:18; *Bowling*, 51 Va. App. at 106.

For these reasons, the trial court did not abuse its discretion by admitting the home security surveillance footage that eyewitness Hinton testified captured the victim's murder.

## II. Sufficiency of the Evidence[7]

The appellant challenges the sufficiency of the evidence to prove that he was the person who shot the victim. He also contends that the evidence did not establish that the killing was willful, deliberate, and premeditated.

In reviewing the sufficiency of the evidence, the Court defers to the jury's findings of fact unless they are plainly wrong or without evidence to support them. *See Secret v. Commonwealth*, 296 Va. 204, 228 (2018). This deference is owed to both the assessment of the credibility of the witnesses and the reasonable inferences to be drawn from basic facts to ultimate facts. *See Commonwealth v. Hudson*, 265 Va. 505, 514 (2003). "Viewing the record through this evidentiary prism requires [the Court] to 'discard the evidence of the accused in conflict with that of the Commonwealth . . . .'" *Cooper v. Commonwealth*, 54 Va. App. 558, 562 (2009) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)). "[A] reviewing court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Robinson v. Commonwealth*, 70 Va. App. 509, 513 (2019) (en banc) (quoting *Crowder v. Commonwealth*, 41 Va. App. 658, 663 (2003)). Instead, the appellate court "ask[s] whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Crowder*, 41 Va. App. at 663).

### A. Identity of the Shooter

The appellant challenges the sufficiency of the evidence to prove that he was the shooter. He argues that Hinton, the only witness who affirmatively identified him, was inherently incredible and not worthy of belief. Additionally, he suggests that the evidence was insufficient to exclude the reasonable hypothesis that someone else committed the crime.

---

[7] We assume without deciding that the appellant's challenge to the sufficiency of the evidence supporting his murder conviction also amounts to a challenge to his related firearm conviction. *See McGinnis*, 296 Va. at 501.

"[D]etermining the credibility of the witnesses and the weight afforded [their] testimony . . . are matters left to the trier of fact, who has the ability to hear and see them as they testify." *Raspberry v. Commonwealth*, 71 Va. App. 19, 29 (2019) (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)).  This Court will not disturb a credibility finding on appeal unless the "testimony was 'inherently incredible[] or so contrary to human experience as to render it unworthy of belief.'"  *Johnson v. Commonwealth*, 58 Va. App. 303, 315 (2011) (quoting *Robertson v. Commonwealth*, 12 Va. App. 854, 858 (1991)); *see Gerald v. Commonwealth*, 295 Va. 469, 486-87 (2018).  "To be 'incredible,' testimony 'must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'"  *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006) (quoting *Cardwell v. Commonwealth*, 209 Va. 412, 414 (1968)).  If a witness testifies to facts "which, if true, are sufficient" to support the conviction and the fact finder bases its decision "upon that testimony[,] there can be no relief" in this Court.  *Smith v. Commonwealth*, 56 Va. App. 711, 718-19 (2010) (quoting *Swanson v. Commonwealth*, 8 Va. App. 376, 379 (1989)).

Here, the appellant's allegations that Hinton's testimony was inherently incredible are very specific.  He argues that she had a motive to accuse him.  He notes that Hinton was angry with him because he broke up with her and was dating someone new.  He also suggests that she implicated him out of concern "due to her [own] involvement" and fear that she "could be an accessory."  Finally, the appellant points to the fact that Hinton was "dishonest" with the police when she originally claimed that he had abducted her.

It is well established that the mere fact that a witness may have a motive to lie does not render that witness's testimony inherently incredible.  *See Kelley v. Commonwealth*, 69 Va. App.

617, 627 (2019). Consequently, none of the claims regarding Hinton's motives compel the conclusion that her testimony was inherently incredible as a matter of law.

With regard to the appellant's claim that Hinton was angry with him for ending their relationship, defense counsel had a full opportunity to cross-examine Hinton about the fact that the appellant broke up with her, as well as the extent to which she might have wanted to get back at him for hurting her. The jury was able to assess the impact of that information on Hinton's truthfulness and was free to find her a credible witness in spite of it. *See id.*

With regard to the appellant's claim that Hinton had a motive to falsely identify him as the perpetrator to protect herself, he does not explain how identifying him falsely would accomplish such a goal. Other evidence—the testimony of a second eyewitness, bystander LaKeisha Murray—established that the shooter was a male in a white shirt, and no evidence indicated that Hinton was the person who shot the victim. Accordingly, the evidence did not implicate Hinton as the actual shooter, and if Hinton was an accomplice, she was an accomplice regardless of the identity of the actual perpetrator.

Finally, Hinton's prior false statement that the appellant kidnapped her did not render her testimony inherently incredible. The fact that a witness had made prior inconsistent statements is "a factor in determining the credibility of a witness," but such statements "do[] not automatically render the witness'[s] testimony incredible [as a matter of law]." *Fordham v. Commonwealth*, 13 Va. App. 235, 240 (1991). Where a single witness makes contradictory statements, those statements "go not to competency but to the weight and sufficiency of the testimony. If the trier of the facts sees fit to base [its ruling] upon that testimony[,] there can be no relief in the appellate court." *Towler v. Commonwealth*, 59 Va. App. 284, 291 (2011) (quoting *Swanson*, 8 Va. App. at 379).

Hinton knew the appellant and was with him on the day of the murder. She testified explicitly that she "saw [the appellant] murder his uncle." She admitted on both cross-examination and redirect examination that she "did tell [a] lie" about being abducted but explained that she did so "out of fear." Hinton was emphatic, however, that "one thing [she was] not lying about [was the appellant] murdering his uncle in front of [her]." She also testified that the only statement she ever made to police about the shooting itself was that she saw the appellant shoot his uncle in the chest. Under settled legal principles, her identification testimony was not inherently incredible, and the jury was entitled to accept it as proof that the appellant was, in fact, the person who shot the victim. *See McCary v. Commonwealth*, 36 Va. App. 27, 41 (2001) ("[T]he testimony of a single witness, if found credible by the [trier of fact] and not found inherently incredible by this Court, is sufficient to support a conviction.").

Hinton's trial testimony—which was not inherently incredible and was sufficient on its own to prove that the appellant was the shooter if believed by the jury—was corroborated by other evidence. A second eyewitness, LaKeisha Murray, described the shooting in terms very similar to Hinton except that Murray did not personally know the people involved and consequently could not identify them by name. Regardless, she knew the shooter was a man in a white shirt and dark pants, and she heard a woman at the scene refer to the shooter as "Tre." The appellant, whose first name is Trequan, was seen wearing a white shirt immediately prior to the shooting by his cousin, Richard Archer. Similarly, he was seen wearing a white shirt and dark shorts immediately after the shooting in surveillance videos from a convenience store and a hotel. Police were able to locate these videos because Hinton told them truthfully where she and the appellant went immediately after the shooting.

The appellant, by contrast, lied to the police concerning his whereabouts at the time of the shooting and afterward. Although he admitted being with the victim in the vicinity of the

- 16 -

shooting, he claimed that he went to the convenience store with the victim and waited while he went inside. The appellant also asserted that he left the store in a car with his new girlfriend while the victim walked home and was shot along the way. Detective Mansfield, however, obtained surveillance video of the area outside the convenience store, in which he saw only the victim, not the appellant. Mansfield also spoke to the appellant's new girlfriend. The detective testified that he was unable to confirm any aspect of the appellant's purported alibi, whereas the security videos he obtained as a result of Hinton's report showed that she and the appellant were exactly where she said they were after the shooting. Based on the evidence, including the testimony of various witnesses, the jury was entitled to conclude that the appellant's false statements proved nothing more than that he "lied to conceal his guilt." *See, e.g.*, *Rams v. Commonwealth*, 70 Va. App. 12, 27 (2019) (recognizing that the fact finder, "in drawing inferences from the evidence," could reach such a conclusion "regarding even a non-testifying defendant").

Additionally, the firearm found on the floorboard where the appellant was seated in the car at the time of his arrest directly connected him to the victim's murder. The firearm was identified by multiple witnesses as the one that the appellant carried both before and after the murder. Ballistics evidence established that the two cartridge casings and bullet fragment found at the scene of the murder were fired from that gun.

Despite the appellant's claims to the contrary, the evidence was sufficient to prove that he was the shooter and to eliminate all reasonable hypotheses of innocence with regard to identity. *See, e.g.*, *Commonwealth v. Moseley*, 293 Va. 455, 464 (2017) (citing *Hudson*, 265 Va. at 513-14). The fact finder "determines which reasonable inferences should be drawn from the evidence[] and whether to reject as unreasonable the hypotheses of innocence advanced by a defendant." *Id.* "[T]he question," therefore, "is not whether 'some evidence' support[ed] the

hypothesis, but whether a rational factfinder could have found the incriminating evidence render[ed] the hypothesis of innocence unreasonable." *James v. Commonwealth*, 53 Va. App. 671, 682 (2009). Ultimately, whether the evidence excluded all reasonable hypotheses of innocence is a "'question of fact,'" and like any other factual finding, it is subject to "revers[al] on appeal only if plainly wrong." *See, e.g.*, *Thorne v. Commonwealth*, 66 Va. App. 248, 254 (2016) (quoting *Stevens v. Commonwealth*, 38 Va. App. 528, 535 (2002)).

The evidence that a cousin named Trevon may also have had a motive to kill the victim does not constitute a reasonable hypothesis of innocence on the facts of this case. No evidence placed Trevon near the scene of the shooting, whereas the appellant admitted he was in the company of the victim that evening and additional evidence proved that the appellant was the shooter. The jury, serving as the fact finder, was entitled to credit the testimony of Hinton and others, reject the appellant's claimed alibi, and conclude that the evidence proved that it was the appellant, not Trevon, who shot the victim. By doing so, the jury eliminated the appellant's claimed hypothesis of innocence, and its decision to do so was not plainly wrong.

### B. Evidence of a Willful, Deliberate, and Premeditated Killing

The appellant contends that the evidence was insufficient to elevate the killing from second-degree to first-degree murder because it did not prove that he acted "willfully, deliberately, and with premeditation." He argues that the evidence did not provide a motive for the shooting. Instead, he suggests that, at most, it established "the escalation of a fight."

Virginia law recognizes the "inference" that "an unlawful homicide is murder in the second degree." *Williams v. Commonwealth*, 57 Va. App. 341, 354 (2010) (quoting *Hodge v. Commonwealth*, 217 Va. 338, 343 (1976)). Proof that a killing was "willful, deliberate, and premeditated" elevates the offense to "murder of the first degree." Code § 18.2-32; *see Willis v. Commonwealth*, 37 Va. App. 224, 230 (2001). Whether a murder was willful, deliberate, and

- 18 -

premeditated is a question of fact for the jury. *Beavers v. Commonwealth*, 245 Va. 268, 283 (1993); *see Avent v. Commonwealth*, 279 Va. 175, 208 (2010).

Premeditation "means adopting a specific intent to kill." *Jordan v. Commonwealth*, 50 Va. App. 322, 328 (2007); *see Rhodes v. Commonwealth*, 238 Va. 480, 486 (1989). That intent, however, "need not exist for any specified length of time . . . provided the accused had time to think and did intend to kill." *Kirby v. Commonwealth*, 50 Va. App. 691, 700 (2007) (quoting *Remington v. Commonwealth*, 262 Va. 333, 352 (2001)); *see id.* (holding that the intent "needs to exist *only for a moment*" (emphasis added) (quoting *Coles v. Commonwealth*, 270 Va. 585, 590 (2005))); *see also Giarratano v. Commonwealth*, 220 Va. 1064, 1074 (1980) (holding that the fact that the defendant had "seconds" to "deliberate" after telling the victim to "shut up" but before killing her supported a finding of premeditation).

Whether a defendant formed the requisite intent, including acting with premeditation, may be proved by circumstantial evidence. *Fields v. Commonwealth*, 73 Va. App. 652, 674 (2021); *see Rhodes*, 238 Va. at 486. Circumstantial evidence "is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis" of innocence. *Stevens*, 38 Va. App. at 535 (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983)). Relevant circumstances include the defendant's statements and actions in the context in which the events occurred. *Long v. Commonwealth*, 8 Va. App. 194, 198 (1989) (citing *Hargrove v. Commonwealth*, 214 Va. 436, 437 (1974)); *see Epps v. Commonwealth*, 216 Va. 150, 156 (1975). Although motive is not an element of murder, proof of motive may contribute to establish a required element like intent. *See Cantrell v. Commonwealth*, 229 Va. 387, 397 (1985).

Here, the evidence, viewed under the proper standard, fully supports the jury's finding that the appellant acted willfully, deliberately, and with premeditation. The testimony of Archer

and Hinton established that there was "tension" between the appellant and the victim.  Hinton

elaborated that the appellant was "livid" with him.  The appellant had just learned that evening

that the victim had told Hinton something "very personal" about the appellant.  After learning

about this, the appellant arranged for Hinton to wait for him in her car just down the street from

the house where the two men lived.  Prior to leaving the house with the victim, the appellant

asked him whether he had his gun.  The appellant then lured the victim out of the house, taking a

particular route.  That route went directly past the location where Hinton waited.  The appellant

confronted the victim with a raised voice in an aggressive manner, pulled a firearm from his side,

and fired it three times at the victim.  Although the gun jammed, the appellant took the time to

manipulate the gun's slide and then fired a fourth time from close range, this time striking the

victim in the chest.  When the victim ran, the appellant pursued him and fired a fifth shot.  This

evidence establishes that the appellant acted willfully, deliberately, and with premeditation.  *See*

*Kasi v. Commonwealth*, 256 Va. 407, 425-26 (1998) (holding that the defendant acted with

premeditation where he shot through the rear window of a man's car, wounding him, and then "a

few seconds" later, "appeared at the front of the [man's] vehicle and fired at him again"); *see*

*also Schmitt v. Commonwealth*, 262 Va. 127, 143 (2001) (upholding a finding of premeditation

where the defendant formed the intent to kill a bank guard "seconds" in advance).

   The evidence further showed that the appellant fled the scene in a calculated manner.

When he got into the car, he immediately told Hinton which way to drive to leave the

neighborhood in order to avoid passing the family residence.  Additionally, he stayed in different

hotels for two nights prior to his arrest, in an apparent effort to avoid detection, and he threatened

family members gathered to honor the victim when they questioned him about what had

happened.  *See Avent*, 279 Va. at 208 (recognizing that the jury may "properly consider" the

defendant's "lack of remorse and efforts to avoid detection" in deciding whether premeditation and deliberation existed (quoting *Epperly v. Commonwealth*, 224 Va. 214, 232 (1982))).

The appellant's suggestion that the killing occurred "based on the escalation of a fight and not [in] calculated premeditation" misconstrues the evidence. Contrary to the appellant's assertion, Murray, whom the appellant credits as "a completely disinterested witness," did not claim that "the victim and shooter were involved in a loud dispute [that] attracted [her] attention and continued for an amount of time before a gun was draw[n] and shots [were] fired." Instead, she testified that the appellant was engaged in a loud telephone call and that this was what initially attracted her attention to his presence in the area.[8] Murray explained that sometime later, after she had heard the appellant on the telephone, she heard him raise his voice in anger again, this time directed toward another man she could see standing with him on the corner. Murray also heard a woman say, "Tre, chill," and "[c]ool and chill," and then the appellant began firing the weapon at the victim. Her testimony supports the conclusion that the shooting did not occur as the culmination of an escalating verbal altercation, and the evidence supports the jury's finding of premeditation.

CONCLUSION

We hold that the trial court did not err. The court's admission of the firearm and body camera footage showing the gun and its seizure from the car floorboard at the time of the appellant's arrest was not an abuse of discretion because the appellant did not establish that collateral estoppel principles applied and failed to preserve other aspects of his challenge to the admissibility of this evidence for appeal. Further, to the extent the appellant preserved his

---

[8] Hinton also testified that the appellant engaged in a heated phone call. She said that this loud phone conversation, which allegedly involved the appellant and his new girlfriend, took place while he waited for the victim to return from the store and was unrelated to his dispute with the victim.

challenge to the admissibility of the home security footage, the record does not establish that the court abused its discretion by admitting that footage. Finally, the evidence proved that the appellant was the shooter and that he killed the victim willfully, deliberately, and with premeditation. Consequently, we affirm the appellant's convictions. We remand the matter to the trial court for the sole purpose of correcting a clerical error in the conviction and sentencing orders.[9]

*Affirmed and remanded.*

---

[9] The indictments charged the appellant with murder and use of a firearm in the commission of a felony, with both offenses alleged to have occurred on or about September 22, 2019. The evidence at trial conformed to those allegations. The conviction and sentencing orders, however, erroneously list the firearm offense as having occurred on September 11, 2019. Therefore, we remand solely for correction of the clerical errors regarding the offense date in the conviction and sentencing orders. *See* Code § 8.01-428(B); *Howell v. Commonwealth*, 274 Va. 737, 739 n.* (2007); *Tatum v. Commonwealth*, 17 Va. App. 585, 592-93 (1994).